UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONALD L. SHERIDAN, JR [Pro Se], ) | |
| ) | |
| Plaintiff ) | CASE NUMBER: 16-cv-00805 (KBJ) |
| ) | |
| vs. ) | |
| ) | |
| U.S. OFFICE OF PERSONNEL MANAGEMENT ) | |
| ) | |
| Defendant ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ronald L. Sheridan, Jr. opposes Defendant's September 13, 2016 Motion for Summary

Judgment, and cross-moves for summary judgment in favor of Plaintiff.

A Response to Defendant's Statement of Material Facts not in Genuine Dispute, Plaintiff's Statement

of Material Facts not in Genuine Dispute, a Memorandum of Points and Authorities in Opposition to

Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary

Judgment, a Declaration and supporting Exhibits, and a proposed Order are filed herewith.

Respectfully Submitted,

Ronald L. Sheridan, Jr.
345 N Springdale Rd.
Westminster, MD 21158-4043
410 984 3873
opm-foia-lawsuit@leebert.org

RECEIVED

OCT 3 1 2016

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RONALD L. SHERIDAN, JR [Pro Se],    )
    )
    Plaintiff    )   CASE NUMBER:  16-cv-00805 (KBJ)
    )
    vs.    )
    )
U.S. OFFICE OF PERSONNEL MANAGEMENT    )
    )
    Defendant    )

**RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

As per LCvR 7.1(h), this statement is submitted in response to Defendant's "Statement of Material Facts Not in Genuine Dispute".

1.  Paragraph 1:  Plaintiff does not dispute of Defendant's statements in this paragraph.

2.  Paragraph 2:  Plaintiff does not generally dispute the description of OPM's function, except to (perhaps pedantically) note that, contrary to the implication of Plaintiff's statement, OPM is not the sole human resources provider in the "executive branch" – its role is limited to civil service and other such organizations exist that service the executive branch (e.g., the DoD Defense Civilian Personnel Advisory Service).  Plaintiff lacks sufficient information to form a belief of the truth or falsity of the numbers provided by Defendant as to the number of background investigations performed by the agency; however, Plaintiff submits that these numbers are not material facts.

3.  Paragraph 3:  Plaintiff does not dispute the description of e-QIP; however, Plaintiff lacks sufficient information to form a belief of the truth or falsity of the qualitative assertion that e-QIP is "secure".

4.  Paragraph 4:  Plaintiff does not dispute of Defendant's statements in this paragraph.

5.   Paragraph 5:  Plaintiff does not dispute the description of e-QIP; however, Plaintiff lacks

sufficient information to form a belief of the truth or falsity of the qualitative assertion that e-QIP is

"secure".  The broad public availability of the referenced forms is not disputed.  Plaintiff lacks sufficient

information to form a belief of the truth or falsity of Defendant's statement as to the criteria by which

OPM grants access to e-QIP.

6.   Paragraph 6:  Plaintiff submits that OPM's statement in paragraph 6 constitutes a legal

conclusion, which Plaintiff disputes.

7.   Paragraph 7:  Plaintiff submits that OPM's statement in paragraph 7 constitutes a legal

conclusion, which Plaintiff disputes.

8.   Paragraph 8:  Plaintiff lacks sufficient information to form a belief of the truth or falsity of

Defendant's statement in paragraph 8.

9.   Paragraph 9:  Plaintiff submits that OPM's statement in paragraph 9 constitutes both opinion

and legal conclusions, which Plaintiff disputes.  (Said Decl. ¶¶21-24)

10.  Paragraph 10:  Plaintiff submits that OPM's statements in this paragraph constitute legal

conclusions, which Plaintiff disputes, with the exception of that factual statement that OPM has

withheld the records, which Plaintiff does not dispute.

Respectfully Submitted,

Ronald L. Sheridan, Jr.
345 N Springdale Rd.
Westminster, MD 21158-4043
410 984 3873
opm-foia-lawsuit@leebert.org

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONALD L. SHERIDAN, JR [Pro Se], | ) |
| Plaintiff | )  CASE NUMBER:  16-cv-00805 (KBJ) |
| vs. | ) |
| U.S. OFFICE OF PERSONNEL MANAGEMENT | ) |
| Defendant | ) |

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

As per LCvR 7.1(h), Plaintiff submits this statement of material facts for which Plaintiff contends there is no genuine issue, in support of Plaintiff's Motion for Summary Judgment.  Record materials cited herein are the Plaintiff's Complaint ("Complaint"), Defendant's Answer to Plaintiff's Complaint ("Answer"), the June 24, 2016 Joint Status Report and Proposed Schedule ("JSR"), the Defendant's September 13, 2016 Motion for Summary Judgment ("Def.'s MSJ") and the Declaration ("Anderson Decl.") and Exhibits therein, and the Declaration ("Said Decl.") and Exhibits submitted in support of this Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment.

### PLAINTIFF'S FOIA REQUEST

1.    Defendant U.S. Office of Personnel Management (OPM) is an independent agency of the Executive branch of the United States government, headquartered in the District of Columbia. Complaint ¶5, Answer ¶5

2.    OPM operates a computer system known as Electronic Questionnaires for Investigations Processing ("e-QIP").  OPM maintains records related to e-QIP, including computer files containing documentation and source code. Complaint ¶5-6, Answer ¶5-6, Anderson Decl., ¶¶ 12-13.

3.    Plaintiff sought certain records maintained by OPM related to e-QIP under the Freedom of
Information Act.  On April 15, 2015, Plaintiff submitted a Freedom of Information Act request to OPM
via e-mail, requesting records including '[c]omputer files containing the source code to the Office of
Personnel Management's "Electronic Questionnaires for Investigations Processing (e-QIP)" application
and computer files or hardcopy records containing design and operations documentation for e-QIP.'
(See Ex. 1 to Anderson Decl.)

4.    Plaintiff's request was answered with an auto-reply message giving only a generic statement
that the request had been received.  Complaint ¶10, Answer ¶10  (See Ex. 2 to Anderson Decl.)

5.    Plaintiff received an e-mail from OPM on April 17th that contained an acknowledgment letter
confirming that the request had been received, and assigning it "request number" 2015-02551.  The
acknowledgment letter did not indicate whether OPM had determined if it would release the requested
records. Complaint ¶¶11-12, Answer ¶¶11-12 (See Ex. 3 to Anderson Decl.)

6.    Plaintiff made two subsequent requests to inquire as to the status of his request, receiving
generic auto-replies to both requests.  Complaint ¶¶14-15, Answer ¶¶14-15 (See Ex. 4 and 5 to
Anderson Decl.)

7.    On December 24, 2015, Plaintiff received an e-mail message from OPM which read, in part:
"Your FOIA coordinator, and the person to whom your request was assigned, is out of the office until
Friday, January 1st.  I have copied Tiffany Ford on this response so she can provide an update to you
once she returns to work on Monday, January 4th." Complaint ¶16, Answer ¶16

8.    On February 1, 2016, Plaintiff submitted an administrative appeal of the constructive denial as
per the appeals process documented on the FOIA section of OPM's public website.   Complaint ¶23,
Answer ¶23 (See Ex. 3 to Anderson Decl.)

9.   Defendant did not issue a response to Plaintiff's administrative appeal.  Answer ¶26

10.   Defendant did not make a final determination as to its intentions to release the records until well after Plaintiff filed suit, had not done so as of the Joint Status Report, and only anticipated doing so "by the end of July, 2016". JSR ¶4

11.   Plaintiff's search for responsive records was limited to a non-specific request to two groups at OPM ("OPM-CIO" and "OPM-FIS" staff).  Plaintiff offers no explanation as to who those groups are, the rationale for why those two groups were deemed to be the only ones likely to have access to responsive records, and what specific search procedures were followed by those groups to ensure that they had reasonably identified all responsive records. Anderson Decl. ¶¶12-13

### EXEMPTION CLAIMS

12.   Defendant's first communication of its final determination to withhold all responsive records was communicated in Defendant's September 13, 2016 Motion for Summary Judgment. Def.'s MSJ ¶10

### THE FUNCTION OF E-QIP

13.   e-QIP's is an administrative tool whose sole function is providing an automated system for the collection and management of information from applicants for background investigations. Its design intention is to "allow individuals to complete the appropriate investigative form and transmit the data through the requesting Government agency to OPM's central computer system." Anderson Decl. ¶16

14.   To that end, e-QIP as it currently is designed stores data submitted by applicants, and provides access to the applicant's submitted data to OPM and agencies who require access to the applicant data. Anderson Decl. ¶14

15.   e-QIP's data collection is limited to providing an electronic version of Standard Form 86 (SF-86), Standard Form 85P (SF-85P), and Standard Form 85 (SF-85). Anderson Decl. ¶¶14-15

16.   The data elements collected by the forms replaced by e-QIP (the SF-86, SF-85P, and SF-85) are publicly known and not considered sensitive – only completed forms are considered sensitive. Anderson Decl. ¶15

### PUBLIC BENEFIT OF SOURCE CODE DISCLOSURE

17.   The release of software source code, generally, is recognized by the Federal government as beneficial both to the public and to the government itself.  Said Decl., ¶7

18.   There are notable examples of the Federal government releasing source code to great public benefit, and notable examples of the Federal government using software based on publicly available source code to its benefit. Said Decl. ¶¶8-9

### THE DECISION TO RELEASE THE RECORDS

19.   A formal risk assessment using standard Federal government risk analysis methodologies will determine that there is no significant risk associated with the release of the e-QIP software. Said Decl. ¶¶21-24

Respectfully Submitted,

Ronald L. Sheridan, Jr.
345 N Springdale Rd.
Westminster, MD 21158-4043
410 984 3873
opm-foia-lawsuit@leebert.org

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RONALD L. SHERIDAN, JR [Pro Se], | ) | |
| | ) | |
| Plaintiff | ) | CASE NUMBER:  16-cv-00805 (KBJ) |
| | ) | |
| vs. | ) | |
| | ) | |
| U.S. OFFICE OF PERSONNEL MANAGEMENT | ) | |
| | ) | |
| Defendant | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

As per LCvR 7.1(h), Plaintiff submits this memorandum of points and authorities in support of Plaintiff's motion for summary judgment.

Plaintiff Ronald L. Sheridan Jr. has brought this action against Defendant, U.S. Office of Personnel Management ("OPM") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  Plaintiff brought this action due to Defendant's failure to respond at all to Plaintiff's lawful request within the statutorily required time period, not "challenging OPM's response to a FOIA request" as stated by the Defendant in its memorandum of points and authorities in support of its motion for summary judgment.

Subsequent to this action, OPM conducted a search and claimed all responsive records to be exempt from disclosure under Exemptions 2 and 7(E) of FOIA.  OPM did not demonstrate that its search was reasonable.  Further, OPM's exemption claims are improper, and there is no legal basis for withholding the requested records.  Summary judgment should therefore be granted in favor of the Plaintiff.

**FACTUAL BACKGROUND**

The accompanying Statement of Material Facts not in Genuine Dispute is incorporated herein by reference.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to the material facts, and the moving party demonstrates it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). FOIA lawsuits are typically resolved on cross-motions for summary judgment. *Reliant Energy Power Generation v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007). A court reviews agency handling of a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B); *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984).

The goal of the Freedom of Information Act is "broad disclosure," and the exemptions must be "given a narrow compass." *Department of Justice v. Tax Analysts*, 492 U. S. 136, 151.  Under the Freedom of Information Act, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency proves that it has fully discharged its FOIA obligations is summary judgment appropriate.  5 U.S.C.A. § 552; *Beveridge & Diamond, P.C. v. United States Department of Health and Human Services*, 85 F. Supp. 3d 230 (D.D.C. 2015).

## ARGUMENT

I.      **OPM DID NOT DEMONSTRATE THAT IT CONDUCTED A REASONABLE SEARCH**

Upon receipt of a request under the FOIA, an agency must search its records for responsive documents. See 5 U.S.C. § 552(a)(3)(A). "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. United States Coast Guard*, 180 F. 3d 321, 325 (D.C. Cir. 1999) (*quoting Truitt v. Dep't of State*, 897 F. 2d 540, 542 (D.C. Cir.1990)); *see also Campbell v. U.S. Dep't of Justice*, 164 F. 3d 20, 27 (D.C. Cir. 1998). Thus, an agency bears the burden of showing that its search was adequate. *Steinberg v. United States Dep't of Justice*, 23 F. 3d 548, 551 (D.C. Cir. 1994).  To meet its

burden, an agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search.  *Perry v. Block*, 684 F. 2d 121, 126 (D.C.  Cir.  1982).

OPM claims that it conducted a reasonable search, referring to the Anderson declaration; however, the referenced paragraphs do not reasonably well describe the search methodology.  Rather, the declaration identifies the location of the records without providing significant detail as to how the agency determined the location of the records, and does not provide a sufficient basis to conclude that the identified records are the only responsive records.

OPM "OPM-FIS and OPM-CIO staff were contacted and asked to provide all design and operations documents" (Anderson Decl. ¶13), but it does not explain who OPM-CIO or OPM-FIS staff are, it does not explain why OPM believes that OPM-OCIO and OPM-FIS staff are the sole custodians of the requested records, and it does not describe how OPM-CIO and OPM-FIS staff conducted their search.

OPM states that the software is developed by contractors for the Department of Energy (DOE) (Anderson Decl. ¶16), but does not provide any rationale as to why responsive records may not be held by either the DOE or the contractor on behalf of OPM.  While OPM does state that the current practice is to maintain all e-QIP source code in a central repository (Anderson Decl. ¶12), it makes no mention of whether or not this has always been the practice over the 16-year lifespan of e-QIP and thus does not provide sufficient information to conclude that responsive records do not exist elsewhere.

OPM has not demonstrated beyond material doubt that its search was reasonably calculated to uncover all relevant documents, and thus has not met the requisite burden of proof to demonstrate a reasonable search.

II.      **OPM DID NOT PROPERLY APPLY EXEMPTIONS 2 AND 7(E)**

The FOIA statute expressly gives the agency the burden of sustaining its decision to withhold information under a FOIA exemption. *Department of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989) (citing 5 U.S.C. 552 (a)(4)(B)).

### A. OPM DID NOT PROPERLY APPLY EXEMPTION 7(E)

Defendant asserts that the requested records were "compiled for a law enforcement purpose" and cites *Mittleman v. OPM*, 76 F.3d 1240 (D.C. Cir. 1996) and *Morley v. CIA*, 508 F.3d 1108, 1129 (D.C. Cir. 2007) to support this claim.

Mittleman does not support the application of Exemption 7 in this instance for several reasons. First, at issue in Mittleman was not the entire background investigation record; rather, OPM had redacted "portions of them identifying the sources of certain information". It does not apply to background investigation information generally; it merely recognizes that some information collected in the course of a background investigation could contain records exempt from disclosure.

Second, *Mittleman* addressed background investigation information itself, not the tools or processes that support the background investigation process. Since Plaintiff's FOIA request does not seek any background investigation data, it is self-evident that this is not applicable.

*Morley* also does not support Defendant's Exemption 7 claim. *Morley* addressed '[b]ackground investigations conducted to assess an applicant's qualification, such as the CIA's "clearance and investigatory processes"'. The description of e-QIP provided by the Defendant makes no mention of the implementation of any investigatory process, or for that matter any function of e-QIP beyond simple collection and transmission of information that was formerly collected on publicly available paper forms. (Anderson Decl. ¶¶14-16) In particular, no e-QIP functionality is described that would be used to evaluate the applicant's submitted information or execute any process designed to actually adjudicate the clearance request. Absent such functionality an understanding of the e-QIP system as it relates to

the investigatory process provides no significant additional information beyond what was already public knowledge – e-QIP collects specific bits of information in either paper or virtual forms and provides the information to OPM or Agency personnel who use the information to conduct their investigation.

Even if the records were compiled for law enforcement purposes, they still would not be exempt from disclosure as would be no harm in their disclosure. OPM claims the specific risk of harm is 7(E), which permits agencies to withhold records compiled for law enforcement purposes if their release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E))

As noted above, e-QIP does not perform any particularly interesting functions with respect to adjudication of background investigations. Understanding the information collected by e-QIP does not provide an applicant with any more information about the investigation adjudication process than simply reading the paper forms. Any other functions of e-QIP involve relatively uninteresting mundane administrative tasks such as transmitting an applicant's completed investigation request to the appropriate federal agency. As such, releasing the requested documents does not by any reasonable standard pose a plausible risk to circumvention of the law.

OPM uses the example of *Piper v. Dep't of Justice*, 294 F. Supp. 2d 16, 30 (D.D.C. 2003), which Plaintiff agrees is a fantastic example of "reasonable risk" as generally found by the Courts. However, there is no reasonable comparison to techniques for conducting polygraph tests and a system such as e-QIP that, as noted above, is basically just an electronic replacement for publicly available forms.

OPM cites *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) to make the point that the standard is "reasonably expected risk", which the Plaintiff does not dispute, but the release of the requested records clearly do not rise to that standard as demonstrated above.

OPM attempts to provide a concrete example of the risk of circumvention, but its example is a logical non-sequitor.  OPM spends its 7(E) argument discussing the risk of disclosure of the techniques and processes used to conduct background investigations with the alleged harm that knowing those techniques and processes could weaken the effectiveness of background investigations, presumably allowing a malicious actor to obtain a favorable investigation by using their inside knowledge of the background investigation to hide their malicious intent.  However, when attempting to provide a practical example to demonstrate this risk, OPM uses the example of "cyber-intrusion" into its systems which contain background investigation information.  This example has nothing to do with the asserted harm of malicious actor using the publicly released e-QIP source code to develop an inside knowledge of the background process to obtain an undeserved favorable investigation.  Rather, it has to do with a malicious actor identifying technical vulnerabilities in the e-QIP system, breaching the system, and exfiltrating data out of the system; an activity that was performed, notably, without access to the source code to the system.

OPM has clearly not fulfilled its burden of proof for its Exemption 7(E) claim, as it both fails to meet the threshold test of Exemption 7 and fails to demonstrate any reasonably expected risk of circumvention of the law.

### B.   OPM DID NOT PROPERLY APPLY EXEMPTION 2

Exemption 2 claims require the agency to establish that the records in question are "related solely internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2). Even if the records are deemed to be related to internal personnel rules and practices, the Supreme Court has held that "[e]xemption 2 does not generally apply to matters…in which there is a genuine and important public interest." *Department of Air Force v. Rose*, 425 U.S. 352 (1976)

OPM claims that it properly relies on Exemption 2 'because the documents at issue relating to the source codes, design and operation of e-QIP - concern the "internal personnel rules and practices" of OPM, which serves as a human resource function for the federal government'. As with its 7(E) argument, OPM conflates the concept of "rules and practices" with the underlying administrative tools used to support those activities. OPM cites examples of signatures, filing instructions, administrative cover sheets, and personnel selection processes. All of these examples are inextricably tied to personnel rules and practices, whereas e-QIP, as a software tool, can be re-purposed for other purposes, albeit perhaps with some modification. (Said Decl. ¶¶ 6-7).

Even if OPM's assertion that the records are related to internal personnel rules and practices is correct, the claimed exemption does not apply because there is a clear public interest in releasing the records. OPM claims that there is no public interest in releasing the source code to e-QIP or its associated manuals, likening it to portions of a U.S. Marshall's Manual. The comparison is not apt: In the case of source code, it is well recognized that source code can be re-used, re-purposed, and improved (Said Decl. ¶¶ 6-7). Indeed, it is the government's own policy that source code should be shared when possible, and that there are significant benefits to both the public and the government when source code can be shared. A recent OMB memo from the United States Chief Information Officer leverages requirements on agencies for increased disclosure of source code and increased use of open source software ("OSS"). (see Ex. 1 to Said Decl.) The memo provides sound rationale for the sharing of source code, including the following:

> Enhanced reuse of custom-developed code across the Federal Government can have significant benefits for American taxpayers, including decreasing duplicative costs for the same code and reducing Federal vendor lock-in…

> While the benefits of enhanced Federal custom-developed code reuse are significant, additional benefits can accrue when source code is also made available to the public as OSS. Making source code available as OSS can enable continual improvement of Federal custom-developed code projects as a result of a broader user community implementing the code for its own purposes and publishing improvements. This collaborative atmosphere can make it easier to

conduct software peer review and security testing, to reuse existing solutions, and to share technical knowledge.

As evidenced by the Federal government's own policy, there is a clear public benefit in releasing source code. There are myriad examples of immense public benefit from the release of government-developed source code. (Said Decl. ¶8)

Given the clear benefits of sharing source code, recognized in policy by the Federal government itself, it is clear that there exists a genuine public interest in the e-QIP source code. As such, OPM is not entitled to Exemption 2.

### C. SEGREGABILITY

In order to demonstrate that all reasonably segregable material has been released, the agency must provide a "detailed justification" for its non-segregability. *Johnson v. Exec. Office for United States Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002) Mere conclusory statements can be inadequate to justify non-segregability, and statements can be considered conclusory "where no factual support is provided for an essential element of the claimed privilege or shield". *Jarvik v. CIA*, 741 F. Supp. 2d 106, 120 (D.D.C. 2010)

OPM provides no significant detail as to the segregability of the responsive records of the source code, relying essentially on conclusory statements that the information is inextricably intertwined and thus non-segregable. (Anderson Decl. ¶¶34)

As such, OPM's claim that it properly segregated the records is not sufficient.

**CONCLUSION**

For the reasons set forth in Plaintiff's motion and supporting documentation, this Court should grant

Plaintiff's motion for summary judgment and order OPM to release the records without redacting the

information within twenty days of this Court's ruling.

Respectfully submitted,

Ronald L. Sheridan, Jr.
345 N Springdale Rd.
Westminster, MD 21158-4043
410 984 3873
opm-foia-lawsuit@leebert.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 31st day of October, 2016, I caused the foregoing to be served on the

following counsel for the Defendant by depositing it in first-class mail, postage pre-paid, and addressed

it as follows:

> JEREMY S. SIMON
> Assistant United States Attorney
> Judiciary Center Building
> 555 Fourth Street, N.W.
> Washington, D.C. 20530

Ronald L. Sheridan, Jr.
345 N Springdale Rd.
Westminster, MD 21158-4043
410 984 3873
opm-foia-lawsuit@leebert.org

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RONALD L. SHERIDAN, JR [Pro Se],          )
                                          )
                 Plaintiff                )     CASE NO: 16-cv-805-KBJ
                                          )
          vs.                             )
                                          )
U.S. OFFICE OF PERSONNEL MANAGEMENT       )
                                          )
                 Defendant                )

### ORDER

Upon consideration of Defendant's motion for summary judgment, Plaintiff's cross-motion for summary judgment, and the oppositions thereto, it is hereby:

ORDERED that Defendant's motion is DENIED;

ORDERED that Plaintiff's Motion is GRANTED; and it is

FURTHER ORDERED that Defendant Office of Personnel Management shall produce to Plaintiff all requested records responsive to Plaintiff's FOIA request within twenty days of this Order.

DATED: _____                    _____
                                                 Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RONALD L. SHERIDAN, JR [Pro Se],    )
                                    )
            Plaintiff               )    CASE NO: 16-cv-805-KBJ
                                    )
        vs.                         )
                                    )
U.S. OFFICE OF PERSONNEL MANAGEMENT )
                                    )
            Defendant               )

**DECLARATION OF KARIM A. SAID**

1.    I am Karim Said, an information security professional currently employed by NASA as the

Headquarters Information Technology and Communications Directorate's Deputy Chief Information

Security Officer (although the views expressed herein are my own and do not reflect the views of my

employer or other affiliates).

2.    I have over a decade of professional experience spanning various aspects of software

development, including security testing and analysis of source code with a focus on web applications

and web-centric technology stacks. My career has also involved an extensive focus on operational

information security as well as information security compliance and risk management in the Federal

government.

3.    I hold multiple advanced academic degrees in technical fields and have authored multiple peer-

reviewed publications related to data analytics and software development and testing. Finally, as my

personal hobbies also include software development and information security, I maintain multiple

community affiliations in that vein. (See Ex. 1)

## TECHNICAL BACKGROUND ON SOURCE CODE

4.   The source code of a piece of software, in general, is the set of computer instructions written by a human that are to be either executed directly or "compiled" into lower-level instructions for the computer to execute. More formally, source code is the collection of the variable definitions and the logical flow paths and manipulations of those variables towards the execution of some functional purpose. Source code adheres to the grammatical constraints and idioms of some programming language and is intended to be human readable (i.e., abstracted at varying levels from the binary machine code that is ultimately executed on computational hardware to make an application run). Well-designed source code adheres to various standards of rigor and best practice, including due consideration for error handling, efficiency of computation, user friendliness, and various aspects of information security.

5.   Source code is similar to other various forms of artistic expression in that all or parts of the code can be re-purposed for other computer programs. For instance, source code that was written to read and display image files for an image editor such as Photoshop could be re-purposed to also read and display image files for a web browser.

## OPEN SOURCE SOFTWARE

6.   The capability of source code to be re-purposed presents unique opportunities when the source code is freely and broadly available. Source code which has been released publicly with the specific intention to allow for re-use, re-purposing, and improvement is typically known as "open source" software. Notable examples of such "open source" software include:

- Linux, an operating system kernel for which the source code has been freely and publicly available since 1991, and now enjoys broad use in applications ranging from supercomputers to Android smartphones.

- Firefox, a web browser that is based on the source code of the previously closed-source, proprietary Netscape web browser.

## BENEFITS OF OPEN-SOURCE SOFTWARE

7.    The Federal government is one of the leading providers of "open source" software, explicitly recognizing the value of open sourcing software developed in the Federal government. The United States Chief Information Officer recently published a memorandum to all agencies titled "Federal Source Code Policy: Achieving Efficiency, Transparency, and Innovation through Reusable and Open Source Software". (See Ex. 2) In this memo, the CIO notes the value of open-source software:

> Enhanced reuse of custom-developed code across the Federal Government can have significant benefits for American taxpayers, including decreasing duplicative costs for the same code and reducing Federal vendor lock-in…

> While the benefits of enhanced Federal custom-developed code reuse are significant, additional benefits can accrue when source code is also made available to the public as OSS. Making source code available as OSS can enable continual improvement of Federal custom-developed code projects as a result of a broader user community implementing the code for its own purposes and publishing improvements. This collaborative atmosphere can make it easier to conduct software peer review and security testing, to reuse existing solutions, and to share technical knowledge.

8.    One of the most notable examples of software released by the Federal government is "VistA", a comprehensive Electronic Health Records system developed for in-house use at the Veteran's Administration. Even though the VA uses this system as a part of a nationwide network interconnected system to house sensitive medical records, the source code to VistA is released in the public domain. VistA has been broadly adopted in the healthcare industry, and its use has spawned the creation of a non-profit organization, "WorldVistA". Their mission statement says: "WorldVistA's mission is to improve healthcare worldwide by making medical information technology better and universally

affordable." WorldVistA states that it "was formed to extend and collaboratively improve the VistA

electronic health record and health information system for use outside of its original setting."[1]

9.    Not only is the Federal government a major provider of open source software, it is a major user

as well. The White House website was a high-profile adopter of the open-source Drupal web content

management system. Supercomputers, including those running highly classified nuclear weapons

simulations, almost universally run an open-source Linux distribution. In fact, based on server headers,

e-QIP itself appears to use the open-source Apache web server, running on the open-source Red Hat

Linux operating system.

10.   The availability of source code not only allows for re-use of the code, it also allows for fixes to

software flaws to be corrected by anyone with the skills and access to the code. Often, these fixes are

provided back to the original developer of the source code, where the fix can be applied to the

"authoritative" source of the software, and the benefits of the security fix can be shared by all. This can,

perhaps counter-intuitively, enhance the security of software through the open availability of underlying

source code. One particularly illustrative example regards OpenSSL, the pervasive open source

encryption software. In 2013 and 2014, multiple identified vulnerabilities in OpenSSL demonstrated

deep architectural issues with the software. Called out by many in the security community as a massive

threat to the security of Internet usage at large, many groups moved quickly to promulgate a remedy.

Perhaps most famously, Google released the open source BoringSSL, which directly augmented the

source code of OpenSSL with a revamped and more secure architecture. Google was not alone, the

OpenBSD project released a major re-write of OpenSSL known as LibreSSL which is recognized as a

significant improvement. Similar examples have played out with popular tools and platforms such as the

Linux operating system, Apache web servers, and Drupal content management systems.

---

[1] http://worldvista.org/

## THE DECISION TO RELEASE SOURCE CODE

11.   Obviously, not all software is open-source software. Software distributed without the source code is pervasive, so it is reasonable to discuss the various reasons why the decision might be made to not release source code.

12.   It is generally recognized that the most common reason to not release the source code to software is for business purposes. In many cases, providing source code to software has the potential make available proprietary information or trade secrets. As noted in the CIO memo quoted above, vendors often use the proprietary nature of their code to "lock in" customers to their products. Although interoperability can usually be achieved by various methods of analyzing closed-source software, having the source code to software can reduce the associated effort significantly.

13.   The argument of the source code providing a "blueprint" which allows for an attacker to find vulnerabilities in the software to exploit is a frequently raised objection to releasing source code. While there can be some merit to this argument, this is usually situation dependent and cannot be a generalized principle. To determine the correct answer for any given case, a risk analysis is usually necessary. Because this specific objection has been raised in this lawsuit, I will provide a detailed analysis of the risk in the case of e-QIP.

## BACKGROUND ON WEB APPLICATION SECURITY

14.   The pervasiveness of Internet connectivity and the development of increasingly web-centric technology stacks has precipitated the popularity of web applications (i.e., software that is primarily accessed over networks, commonly through an Internet browser). e-QIP is one such application. While issues regarding client/server communication have added a new dimension to the security analysis of software, the most common vulnerabilities in web applications stem from classical application security considerations.

15.   Specifically, the Open Web Application Security Project (OWASP) maintains a well-known, industry-standard "Top 10" list of security issues, nearly all of which are rooted in improper user input sanitization and data handling. To understand the concept of input sanitization and data handling, it is useful to imagine a web page on which a user enters their username/password, and clicks "login". Once the "login" button is clicked, the values of the fields containing the username and password are transmitted to the web application, where those values are processed by the code. If the user were to, rather than type their username, instead type some text that would accidentally be interpreted by the web application as a command, a security breach can result. This is a simplistic example, but it is a reasonable characterization of the large majority of vulnerabilities that occur in web-based applications.

16.   Input sanitization and data handling vulnerabilities such as those described above are discoverable in a number of ways. On well-staffed teams, a security analyst may be embedded with software development teams and provide insight into authored source code through direct access to the repositories where the code is stored. Regular peer review and static analysis of contributed source code may be the primary mechanism by which potential vulnerabilities are identified, dispositioned, and ultimately remediated. Just as commonly, security analysis may happen in an environment that is highly detached from the normal course of development. In those cases, security analysts will rely on "black box" testing methodologies, which treat the source code of an application as an unknown variable and rely on the operational testing of a running instance of a piece of software to deduce potential security issues and validate susceptibility to exploits. A robust security analysis will almost certainly involve both analysis of source code and operational testing; however, either sort of analysis is effective in identifying security issues.

17.   Malicious threats can operate in a manner similar to the one described above. In the event that the source code is not available, a threat can adopt a "black box" testing methodology to identify

potential vulnerabilities. While such testing methodologies are generally less efficient, as noted above

they can be similarly effective, especially when combined with broadly available tools for performing

"black-box" testing.

18.   One disadvantage to a malicious threat performing "black box" testing is that their activities

generate observable network traffic which can be detected and often blocked by security measures

implemented by the web application provider. In practice, blocking in this manner is usually ineffective

since almost any minimally competent attacker is both masking their true identity on the network, and

has access to an essentially limitless supply of sources from which to conduct their attack. The net effect

is usually akin to a game of "Whak-a-Mole", slowing a determined attacker, at best.

19.   This context setting as to the nature of source code and brief analysis of security testing

techniques is necessary to simply state that, especially considering the effectiveness of black box testing

techniques and the pervasive availability of tools designed to operational test software applications for

security issues, source code secrecy is wholly ineffective at protecting a software application and

certainly any underlying data which any particular instance of an application may operate over. Certainly

any proprietary web applications on the Internet that have been compromised, of which there are

countless examples, were not protected through the confidentiality of their source code. Popular web

applications LinkedIn, Yahoo!, and even e-QIP have certainly not been immune to compromise as a

result of their proprietary code bases. In fact, the general perception of web applications exposed to the

Internet, proprietary or open source, is that their time to compromise is merely a function of their

attractiveness to attackers of varying motivation and capability.

20.   There are cases where the secrecy of a code base can arguably contribute to security – generally

when an attacker has no access to the running software to perform "black-box" testing. For instance,

the flight control software of a fighter jet may contain security vulnerabilities but because access to

military aircraft is highly controlled, no malicious party is likely to have access to the running software to perform the necessary "black-box" testing. Another example would be hypothetical software utilized by intelligence agencies to collect, analyze, and categorize electronic communications – no malicious party would reasonably have access to the software to perform tests against it.

**E-QIP SPECIFIC RISK ANALYSIS**

21.   Given the general considerations identified above, it is prudent to perform a formal risk analysis to determine if any of the negative considerations apply to e-QIP and to what extent they may pose an undue risk if the software were publicly released.

22.   The Federal government utilizes a standard risk assessment methodology, National Institute for Standards and Technology (NIST) Special Publication (SP) 800-30, *Guide for Conducting Risk Assessments*. SP 800-30 provides common methodology and terminology for risk management in federal agencies, and is generally required for use as per various laws and regulations (e.g., OMB Circular A-130). As such, it is implicitly the most appropriate mechanism for evaluating the risk of releasing the e-QIP source code to a member of the general public.

23.   A copy of this risk analysis is attached which reflects my professional opinion as to the risk posed to OPM's operations and assets, individuals, other organizations, and the Nation. I have determined that, based on the information publicly available to me and documented in the risk analysis, that there is no significant difference in risk to the e-QIP information system posed by releasing the source code to e-QIP. (See Ex. 3)

**CONCLUSION**

24.  Based on the foregoing, it is my professional opinion that the release of the e-QIP software does

not represent a significant risk to OPM's operations and assets, individuals, other organizations, or the

Nation, and that this opinion is reasonably supported by Federal standard risk assessment

methodologies.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to

the best of my knowledge.

Executed this 31st day of October, 2016

Karim A. Said

# Exhibit 1

1000 6th St SW
Suite 112
Washington, DC 20024 USA

http://egyptiankarim.com
karim@egyptiankarim.com
+1 (202) 751-7194

# Karim A. Said

## Education

| | | |
|---|---|---|
| Ph.D. | Human-Centered Computing | University of Maryland Baltimore County (2011-Present) |
| | *Coursework Complete (2013); Comprehensive Exams Passed (2013)* | |
| M.S. | Human-Centered Computing | University of Maryland Baltimore County (2013) |
| M.S. | Information Systems | University of Maryland Baltimore County (2007) |
| B.S. | Computer Science and English | University of Maryland Baltimore County (2004) |

## Publications

### Conference proceedings

**Said, K.**, Kuber, R., Murphy, E. (2014). Towards the development of AudioAuth: an auditory authentication system. Proceedings of iHCI '14, DCU.

**Said, K.**, Williams, M.A., Hurst, A., and Kane, S.K. (2014). Framing the conversation: the role of Facebook conversations in shopping for eyeglasses. Proceedings of CSCW '14, ACM.

### Posters/extended abstracts/workshops

**Said, K.** and Kane, S.K. (2013). Button Blender: remixing input to improve video game accessibility. Extended Abstracts of CHI '13, ACM, 43-48.

### Invited presentations

**Said, K.** (2013). Of mice and researchers: big ideas in HCI. Invited talk at UMBC.

**Said, K.** (2012). Same old song: data mining music across five decades. Invited talk at UMBC.

## Professional affiliations

- Deputy Chief Information Security Officer, NASA Headquarters (2016-Present)
- System Security Analyst, NASA (2010-2016)
- Software Developer, IBM (2007-2010)
- Math and Science Teacher, Annapolis High School (2004-2005)

## Community affiliations

- Member, Association for Computing Machinery (ACM) (2011-Present)
- Member, Unallocated (Hackerspace) (2012-Present)

## Honors and awards

- IBM Service Excellence Award (2009)
- Society of Old Crows Scholar (2000)
- UMBC Presidential Scholar (2000)

Exhibit 2



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

August 8, 2016

M-16-21

## MEMORANDUM FOR THE HEADS OF DEPARTMENTS AND AGENCIES

**FROM:**      Tony Scott
United States Chief Information Officer

Anne E. Rung
United States Chief Acquisition Officer

**SUBJECT:**   Federal Source Code Policy: Achieving Efficiency, Transparency, and
Innovation through Reusable and Open Source Software

The U.S. Government is committed to improving the way Federal agencies buy, build, and
deliver information technology (IT) and software solutions to better support cost efficiency,
mission effectiveness, and the consumer experience with Government programs. Each year, the
Federal Government spends more than $6 billion on software through more than 42,000
transactions.[1] A significant proportion of software used by the Government is comprised of
either preexisting Federal solutions or commercial solutions. These solutions include proprietary,
open source, and mixed source[2] code and often do not require additional custom code
development.

When Federal agencies are unable to identify an existing Federal or commercial software
solution that satisfies their specific needs, they may choose to develop a custom software
solution on their own or pay for its development. When agencies procure custom-developed
source code, however, they do not necessarily make their new code (source code or code)
broadly available for Federal Government-wide reuse. Even when agencies are in a position to
make their source code available on a Government-wide basis, they do not make such code
available to other agencies in a consistent manner. In some cases, agencies may even have
difficulty establishing that the software was produced in the performance of a Federal
Government contract. These challenges may result in duplicative acquisitions for substantially
similar code and an inefficient use of taxpayer dollars.

This policy seeks to address these challenges by ensuring that new custom-developed Federal
source code be made broadly available for reuse across the Federal Government.[3] This is

---

[1] *M-16-12: Improving the Acquisition and Management of Common Information Technology: Software Licensing.*
Office of Mgmt. & Budget, Exec. Office of the President, June 2, 2016.
https://www.whitehouse.gov/sites/default/files/omb/memoranda/2016/m-16-12_1.pdf.
[2] *See* Appendix A for definitions of key technical terms used throughout this policy document.
[3] *See* Section 6 of this policy for additional information about limited exceptions.

1

consistent with the *Digital Government Strategy's* "Shared Platform" approach, which enables Federal employees to work together—both within and across agencies—to reduce costs, streamline development, apply uniform standards, and ensure consistency in creating and delivering information.[4] Enhanced reuse of custom-developed code across the Federal Government can have significant benefits for American taxpayers, including decreasing duplicative costs for the same code and reducing Federal vendor lock-in.[5]

This policy also establishes a pilot program that requires agencies, when commissioning new custom software, to release at least 20 percent of new custom-developed code as Open Source Software (OSS) for three years, and collect additional data concerning new custom software to inform metrics to gauge the performance of this pilot.[6]

While the benefits of enhanced Federal custom-developed code reuse are significant, additional benefits can accrue when source code is also made available to the public as OSS. Making source code available as OSS can enable continual improvement of Federal custom-developed code projects as a result of a broader user community implementing the code for its own purposes and publishing improvements. This collaborative atmosphere can make it easier to conduct software peer review and security testing, to reuse existing solutions, and to share technical knowledge.[7] Furthermore, vendors participating in or competing for future maintenance or enhancement can do so with full knowledge of the underlying source code. A number of private sector companies have already shifted some of their software development projects to an OSS model, in which the source code of the software is made broadly available to the public for inspection, improvement, and reuse.

Several Federal agencies and component organizations have also begun publishing custom-developed code as OSS or without any restriction on use. Some of these include:

- The White House: "We the People" is a White House service that allows the American people to easily and interactively petition their Government. The source code for this website is freely available as OSS;[8]

---

[4] *Digital Government: Building A 21st Century Platform To Better Serve The American People*, Office of Mgmt. & Budget, Exec. Office of the President, May 23, 2012.
https://www.whitehouse.gov/sites/default/files/omb/egov/digital-government/digital-government.html.
[5] "Vendor lock-in" refers to a situation in which the customer depends on a single supplier for a product and cannot easily move to another vendor without sustaining substantial cost or inconvenience. Vendor lock-in can potentially raise costs and stifle innovation and it can result in reduced competition on future related software acquisitions.
[6] *Clinger Cohen Act of 1996*. 40 U.S.C. §§ 11301-11303.
[7] Department of Defense Chief Information Officer. *Clarifying Guidance Regarding Open Source Software (OSS)*. October 16, 2009. "The continuous and broad peer-review enabled by publicly available source code supports software reliability and security efforts through the identification and elimination of defects that might otherwise go unrecognized by a more limited core development team."
http://dodcio.defense.gov/Portals/0/Documents/FOSS/2009OSS.pdf.
[8] "We the People" petitions are accessible at https://petitions.whitehouse.gov/. The source code for "We the People" is available at https://github.com/WhiteHouse/petitions.

- 18F[9] and the Consumer Financial Protection Bureau (CFPB):[10] Both of these organizations have policies that establish a default position to publish source code that is custom-developed by or for the organization. For example, both organizations contribute to the source code for the eRegulations platform,[11] a web-based interface for public viewing and commenting on proposed changes to Federal regulations. The eRegulations platform, which originated at CFPB, is being used by other Federal agencies[12] and continues to be improved based on public feedback;[13]

- The Department of Education: This agency's "College Scorecard" is a citizen-facing OSS website and accompanying application programming interface (API) that provides free tools to help potential students make informed decisions about which colleges or universities to attend;[14] and

- The Department of Defense (DOD): This agency issued a memorandum[15] in 2009 that, among other things, describes the many benefits of OSS that should be considered when conducting market research on software for DOD use.[16]

The Administration made a commitment, as part of its *Second Open Government National Action Plan,*[17] to "develop an open source software policy that, together with the Digital Services Playbook, will support improved access to custom software code developed for the Federal

---

[9] 18F (https://18f.gsa.gov/) is a digital services delivery team within the General Services Administration. The 18F Open Source Policy is described at https://18f.gsa.gov/2014/07/29/18f-an-open-source-team/ and can be accessed at https://github.com/18F/open-source-policy/blob/master/policy.md.

[10] CFPB's source code policy is described at http://www.consumerfinance.gov/blog/the-cfpbs-source-code-policy-open-and-shared/ and can be accessed at https://cfpb.github.io/source-code-policy/.

[11] "eRegulations," CFPB's platform to read regulations, is accessible at http://www.consumerfinance.gov/cregulations/.

[12] The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has adopted a beta version of "eRegulations," accessible at https://atf-eregs.18f.gov/.

[13] The publically accessible open source repository for submitting comments and proposing improvements to the "eRegulations" platform is accessible at https://github.com/eregs/notice-and-comment. 18F also developed https://analytics.usa.gov—jointly with the U.S. Digital Service—to provide a window into how people are interacting with the Federal Government online and made the source code available online (https://github.com/18F/analytics-reporter). The cities of Philadelphia, PA (http://analytics.phila.gov/) and Boulder, CO (https://bouldercolorado.gov/stats) were able to reuse the code to provide their own citizens with real-time information on how city government websites serve citizens.

[14] The Department of Education's College Scorecard is accessible at https://collegescorecard.ed.gov/. The open source repository for the website and API that runs the College Scorecard is available via 18F's GitHub repository, accessible at https://github.com/18F/college-choice.

[15] Department of Defense Chief Information Officer. *Clarifying Guidance Regarding Open Source Software (OSS).* October 16, 2009. http://dodcio.defense.gov/Portals/0/Documents/OSSFAQ/2009OSS.pdf

[16] The Department of Defense's OSS FAQ states that "continuous and broad peer-review, enabled by publicly available source code, improves software reliability and security through the identification and elimination of defects that might otherwise go unrecognized." *Frequently Asked Questions regarding Open Source Software (OSS) and the Department of Defense (DoD),* accessible at https://dodcio.defense.gov/OpenSourceSoftwareFAQ.aspx.

[17] *The Open Government Partnership: Announcing New Open Government Initiatives as part of the Second Open Government National Action Plan for The United States of America.* September 2014. Page 2. https://www.whitehouse.gov/sites/default/files/microsites/ostp/new_nap_commitments_report_092314.pdf.

government."[18] This policy fulfills that commitment in an effort to improve U.S. Government software development and make the Government more open, transparent, and accessible to the public.

## 1. Objectives

This policy will accomplish the following objectives:

- Provide a policy to agencies[19] on considerations that must be made prior to acquiring any custom-developed code;

- Require agencies to obtain appropriate Government data rights to custom-developed code, including at a minimum, rights to Government-wide reuse and rights to modify the code. Agencies shall make such custom-developed code broadly available across the Federal Government, subject to limited exceptions;[20]

- Require agencies to consider the value of publishing custom code as OSS;

- Establish requirements for releasing custom-developed source code, including securing the rights necessary to make some custom-developed code releasable to the public as OSS under this policy's new pilot program; and

- Provide instructions and resources to facilitate implementation of this policy.

## 2. Scope and Applicability

The requirements outlined in this policy apply to source code that is custom-developed for the Federal Government, subject to the limited exceptions outlined in Section 6 of this document. Source code developed for National Security Systems (NSS), as defined in 40 U.S.C. § 11103, is exempt from the requirements of this policy. For NSS, agencies shall follow applicable statutes, Executive Orders, directives, and internal agency policies.

The policies in this document do not apply retroactively (*i.e.*, they do not require that existing custom-developed code be retroactively made available for Government-wide reuse or as OSS). However, making such code available for Government-wide reuse or as OSS, to the extent practicable, is strongly encouraged.

---

[18] The Digital Services Playbook was developed by the U.S. Digital Service and consists of key "plays" that can help the Government build effective digital services. It encourages agencies to "default to open" and seek contracts that specify that "software and data generated by third parties remains under [the U.S. Government's] control, and can be reused and released to the public as appropriate and in accordance with the law." It also requires an explanation "[i]f the codebase has not been released under an open source license." https://playbook.cio.gov/.
[19] For the purposes of this policy, an agency is one that meets the definition of executive agency under the Clinger Cohen Act of 1996. *See* Appendix A.
[20] *See* Section 6 of this policy for additional information about limited exceptions.

4

The agencies' Chief Information Officers (CIO), Chief Acquisition Officers (CAO), and other key stakeholders should promptly begin working together to implement this policy. Agencies are expected to issue internal policies, as necessary, to support these efforts and should expect their progress to be evaluated in accordance with accountability mechanisms described in Section 7.

### 3.   Three-Step Software Solutions Analysis

Agencies must obtain sufficient rights to custom-developed code to fulfill both the Government-wide reuse objectives and the open source release objectives outlined in this policy's pilot program.

In meeting their software needs, agencies must conduct the three-step analysis outlined below. This analysis is intended to leverage existing solutions—consistent with principles of category management[21] and shared services[22]—and suitable commercial solutions, while mitigating duplicative spending on custom-developed software solutions. These steps are consistent with the Office of Management and Budget's (OMB) long-standing policy on investments in major information systems.[23] Moreover, consistent with OMB's memorandum on Technology Neutrality,[24] agencies must consider open source, mixed source, and proprietary software solutions equally and on a level playing field, and free of preconceived preferences based on how the technology is developed, licensed, or distributed.

- *Step 1 (Conduct Strategic Analysis and Analyze Alternatives)*: Each agency must conduct research and analysis prior to initiating any technology acquisition or custom code development. The strategic analysis should consider not only agency mission and operational needs, but also external public initiatives and interagency initiatives such as Cross-Agency Priority Goals. Having conducted the strategic analysis, agencies shall then conduct an alternatives analysis, evaluating whether to use an existing Federal software solution or to acquire or develop a new software solution. The alternatives analysis shall give preference to the use of an existing Federal software solution.[25]

- *Step 2 (Consider Existing Commercial Solutions)*: If an agency's alternatives analysis concludes that existing Federal software solutions cannot efficiently and effectively meet

---

[21] *See Transforming the Marketplace:  Simplifying Federal Procurement to Improve Performance, Drive Innovation, and Increase Savings*, Office of Mgmt. & Budget, Exec. Office of the President, December 4, 2014. https://www.whitehouse.gov/sites/default/files/omb/procurement/memo/simplifying-federal-procurement-to-improve-performance-drive-innovation-increase-savings.pdf.

[22] *M-16-11: Improving Administrative Functions Through Shared Services*, Office of Mgmt. & Budget, Exec. Office of the President, May 4, 2016. https://www.whitehouse.gov/sites/default/files/omb/memoranda/2016/m-16-11.pdf.

[23] *See OMB Circular No. A-11, Appendix J – Principles of Budgeting for Capital Asset Acquisitions*, Office of Mgmt. & Budget, Exec. Office of the President, July 1, 2016. https://www.whitehouse.gov/sites/default/files/omb/assets/a11_current_year/app_j.pdf.

[24] *Technology Neutrality*, Office of Mgmt. & Budget, Exec. Office of the President, January 7, 2011. https://www.whitehouse.gov/sites/default/files/omb/assets/egov_docs/memotociostechnologyneutrality.pdf.

[25] Existing Federal software solutions are those for which appropriate rights are already held by the Government, which may include commercial or custom-developed software solutions.

the needs of the agency, the agency must explore whether its requirements can be satisfied with an appropriate commercially-available solution.[26]

- **_Step 3 (Consider Custom Development):_** If an agency's alternatives analysis concludes that an existing Federal software solution or commercial solution cannot adequately satisfy its needs, the agency may consider procuring custom-developed code in whole or in conjunction with existing Federal or commercial code. When commissioning new custom-developed software, agencies must consider the value of publishing custom code as OSS and negotiate data rights reflective of its value-consideration. Agencies must also obtain sufficient rights to fulfill this policy's objectives related to Government-wide code reuse and the open source pilot program.

Agencies must also consider several factors throughout each stage of the three-step analysis:

A. <u>Hybrid Solutions</u>: Solutions containing a mixture of existing Federal, commercial, and/or custom-developed solutions should be considered throughout each step of the analysis.

B. <u>Modular Architecture</u>: Agencies should consider modular approaches to solution architecture. As discussed in the _Digital Government Strategy_, modularity can reduce overall risk and cost while increasing interoperability and technical flexibility.

C. <u>Cloud Computing</u>: Consistent with OMB strategy, agencies are encouraged to evaluate safe and secure cloud computing options throughout each step of the analysis.[27]

D. <u>Open Standards</u>: Regardless of the specific solution selected, all software procurements and Government software development projects should consider utilizing open standards whenever practicable in order to increase the interoperability of all Government software solutions. Open standards enable software to be used by anyone at any time, and can spur innovation and growth regardless of the technology used for implementation—be it proprietary, mixed source, or OSS in nature.

E. <u>Targeted Considerations</u>: Agencies must select a software solution that best meets the operational and mission needs of the agency, taking into consideration factors such as performance, total life-cycle cost of ownership, security and privacy protections, interoperability, ability to share or reuse, resources required to later switch vendors, and availability of quality support. These considerations should be taken into account during all three steps of the analysis.

---

[26] Preference must first be given to procurement of existing commercial solutions through best-in-class vehicles identified by category management policies.

[27] _Federal Cloud Computing Strategy_, Office of Mgmt. & Budget, Exec. Office of the President, February 8, 2011. https://www.whitehouse.gov/sites/default/files/omb/assets/egov_docs/federal-cloud-computing-strategy.pdf.

### 4. Government-Wide Code Reuse

Ensuring Government-wide reuse rights for custom code that is developed using Federal funds has numerous benefits for American taxpayers. To realize these benefits, agencies must comply with the following requirements:

#### A. Secure Rights for Government Reuse and Ensure Delivery of Source Code

Agencies that enter into contracts for the custom development of software shall—at a minimum—acquire and enforce rights sufficient to enable Government-wide reuse of custom-developed code. Agencies must ensure appropriate contract administration and use of best practices to secure the full scope of the Government's rights, including—but not limited to—sharing and using the code with other Federal agencies.

Additionally, in order to ensure the ability to exercise these rights, agencies must use best practices to ensure delivery of the custom-developed code, documentation, and other associated materials from the developer throughout the development process.

#### B. Inventory All Custom-Developed Code and Make It Available Government-Wide

Securing adequate rights to enable Government-wide reuse of custom-developed code is a critical first step in gaining efficiencies in Federal software purchasing; however, without broad and consistent dissemination of the code across the Federal Government, these efficiencies cannot be fully realized. Therefore, in addition to securing the rights discussed above, agencies shall do the following:

  i. Maintain a Code Inventory: As part of their broader responsibility to maintain an up-to-date inventory of agency information resources, agencies shall make custom-developed code and related information available to all other Federal agencies[28] by creating and maintaining an enterprise code inventory that lists all new code that is custom-developed for the Federal Government; and

 ii. Make Custom-Developed Code Available: Agencies shall make custom-developed code available for Government-wide reuse and make their code inventories discoverable at https://www.code.gov ("Code.gov"), pursuant to the limited exceptions outlined in Section 6 of this policy.

Agencies may refer to Section 7 of this document for additional information regarding their individual responsibilities related to implementing this policy.

---

[28] See Section 6 of this policy for additional information about limited exceptions.

## 5.  <u>Open Source Software</u>

### 5.1 Pilot Program: Publication of Custom-Developed Code as OSS

Each agency shall release as OSS <u>at least 20 percent</u> of its new custom-developed code[29] each year for the term of the pilot program. As discussed above, agencies must obtain sufficient rights to custom-developed code to fulfill the open source release objectives of this policy's pilot program.

When deciding which custom-developed code projects to release, each agency should prioritize the release of custom-developed code that it considers potentially useful to the broader community. Agencies should calculate the percentage of source code released using a consistent measure—such as real or estimated lines of code, number of self-contained modules, or cost—that meets the intended objectives of this requirement. Additional information regarding how best to measure source code will be provided on Code.gov.

Although the minimum requirement for OSS release is 20 percent of custom-developed code, agencies are strongly encouraged to release as much custom-developed code as possible to further the Federal Government's commitment to transparency, participation, and collaboration.

OMB expects all agencies to satisfy the requirements of this pilot program without exception. Agencies should—as part of their selection of custom-developed code to be released as OSS— refrain from selecting code that would fall under the exceptions outlined in Section 6 of this policy. In the event that an agency's CIO believes that the agency cannot satisfy the 20 percent requirement of the OSS pilot program (*e.g.*, because releasing code as OSS would create an identifiable risk to the detriment of national security), the CIO should consult with OMB.

Unless extended or supplanted by OMB through the issuance of further policy, the pilot program under this sub-section will expire three years (36 months) after the publication date of this policy; however, the rest of the Federal Source Code Policy will remain in effect. No later than two years after the publication date of this policy, OMB shall evaluate pilot results and consider whether to allow the pilot program to expire or to issue a subsequent policy to continue, modify, or increase the minimum requirements of the pilot program.

Within 120 days of the publication date of this policy, OMB shall develop metrics to assess the impact of the pilot program. Additional information on these topics will be available on Code.gov.

### 5.2 Participation in the Open Source Community

When agencies release custom-developed source code as OSS to the public, they should develop and release the code in a manner that (1) fosters communities around shared challenges, (2) improves the ability of the OSS community to provide feedback on, and make contributions to, the source code, and (3) encourages Federal employees and contractors to contribute back to the

---

[29] The definition of "custom-developed code" can be found in Appendix A.

broader OSS community by making contributions to existing OSS projects. In furtherance of this strategy, agencies should comply with the following principles:

A. Leverage Existing Communities: Whenever possible, teams releasing custom-developed code to the public as OSS should appropriately engage and coordinate with existing communities relevant to the project. Government agencies should only develop their own communities when existing communities do not satisfy their needs.

B. Engage in Open Development: Software that is custom-developed for or by agencies should, to the extent possible and appropriate, be developed using open development practices. These practices provide an environment in which OSS can flourish and be repurposed. This principle, as well as the one below for releasing source code, include distributing a minimum viable product as OSS; engaging the public before official release;[30] and drawing upon the public's knowledge to make improvements to the project.

C. Adopt a Regular Release Schedule: In instances where software cannot be developed using open development practices, but is otherwise appropriate for release to the public, agencies should establish an incremental release schedule to make the source code and associated documentation available for public use.

D. Engage with the Community: Similar to the requirement in the Administration's *Open Data Policy*, agencies should create a process to engage in two-way communication with users and contributors to solicit help in prioritizing the release of source code and feedback on the agencies' engagement with the community.

E. Consider Code Contributions: One of the potential benefits of OSS lies within the communities that grow around OSS projects, whereby any party can contribute new code, modify existing code, or make other suggestions to improve the software throughout the software development lifecycle. Communities help monitor changes to code, track potential errors and flaws in code, and other related activities. These kinds of contributions should be anticipated and, where appropriate, considered for integration into custom-developed Government software or associated materials.

F. Documentation: It is important to provide OSS users and contributors with adequate documentation of source code in an effort to facilitate use and adoption. Agencies must ensure that their repositories include enough information to allow reuse and participation by third parties. In participating in community-maintained repositories, agencies should follow community documentation standards. At a minimum, OSS repositories maintained by agencies must include the following information:
   i. Status of software (*e.g.*, prototype, alpha, beta, release, etc.);
   ii. Intended purpose of software;

---

[30] For the purposes of this policy, an "official release" is a release that is not in the alpha or beta test phases and, in the field of computer programming, would typically be designated with a version number 1.0.

   iii. Expected engagement level (*i.e.*, how frequently the community can expect agency activity);
   iv. License details; and
   v. Any other relevant technical details on how to build, make, install, or use the software, including dependencies (if applicable).

## 6. Exceptions to Government Code Reuse

The exceptions provided below may be applied, in specific instances, to exempt an agency from sharing custom-developed code with other Government agencies. These exceptions do not apply to the OSS pilot program.[31] Any exceptions used must be approved and documented by the agency's CIO for the purposes of ensuring effective oversight and management of information technology resources.

Applicable exceptions are as follows:

1. The sharing of the source code is restricted by law or regulation, including—but not limited to—patent or intellectual property law, the Export Asset Regulations, the International Traffic in Arms Regulation, and the Federal laws and regulations governing classified information;

2. The sharing of the source code would create an identifiable risk to the detriment of national security, confidentiality of Government information, or individual privacy;

3. The sharing of the source code would create an identifiable risk to the stability, security, or integrity of the agency's systems or personnel;

4. The sharing of the source code would create an identifiable risk to agency mission, programs, or operations; or

5. The CIO believes it is in the national interest to exempt sharing the source code.

For excepted software, agencies must provide OMB a brief narrative justification for each exception, with redactions as appropriate.

## 7. Implementation

### 7.1 Roles and Responsibilities

The Federal Information Technology Acquisition Reform Act (FITARA)[32] creates clear responsibilities for agency CIOs related to IT investments and planning, as well as requiring that agency CIOs be involved in the IT acquisition process. OMB's FITARA implementation

---

[31] *See* Section 5 for additional information regarding the pilot program.
[32] FITARA was codified as part of the *National Defense Authorization Act for Fiscal Year 2015* (Title VIII, Subtitle D, H.R. 3979); accessible at https://www.congress.gov/bill/113th-congress/house-bill/3979.

guidance[33] established a "common baseline" for roles, responsibilities, and authorities of the agency CIO and the roles of other applicable Senior Agency Officials[34] in managing IT as a strategic resource. Accordingly, agency heads must ensure that CIOs and Senior Agency Officials, including CAOs, are positioned with the responsibility and authority necessary to implement the requirements of this policy. As appropriate, Senior Agency Officials should also work with the agency's public affairs staff, open government staff, web manager or digital strategist, program owners, and other leadership to properly identify, publish, and collaborate with communities on their OSS projects.

Moreover, in support of the objectives and requirements of this policy, agencies should strengthen internal capacity to efficiently and securely deliver OSS as part of regular operations. Additional information on this topic will be provided on Code.gov.

## 7.2 Code Inventories and Discovery

Inventories are a means of discovering information such as the functionality and location of potentially reusable or releasable custom-developed code. Within 120 days of the publication date of this policy, each agency must update—and thereafter keep up to date—its inventory of agency information resources to include an enterprise code inventory that lists custom-developed code for or by the agency after the publication of this policy. Each agency's inventory will be reflected on Code.gov. The inventory will indicate whether the code is available for Federal reuse, is available publicly as OSS, or cannot be made available due to a specific exception listed in this policy. Agencies shall fill out this information based on a metadata schema that OMB will provide on Code.gov.

## 7.3 Code.gov

Within 90 days of the publication date of this policy, the Administration will launch https://www.code.gov,[35] an online collection of tools, best practices, and schemas to help agencies implement this policy. The website will include additional materials such as definitions, evaluation metrics, checklists, case studies, and model contract language—with the goal of enabling collaboration across the Federal Government and advancing the Government's partnership with the public.

Additionally, Code.gov will serve as the primary discoverability portal for custom-developed code intended both for Government-wide reuse and for release as OSS. Note that Code.gov is not intended to house the custom-developed code itself; rather, it is intended to serve as a tool for discovering custom-developed code that may be available for Government-wide reuse or as OSS,

---

[33] *M-15-14: Management and Oversight of Federal Information Technology*, Office of Mgmt. & Budget, Exec. Office of the President, June 10, 2015. https://www.whitehouse.gov/sites/default/files/omb/memoranda/2015/m-15-14.pdf.

[34] Senior Agency Officials include positions that may include the Chief Acquisition Officer, Chief Operating Officer, Chief Financial Officer, Chief Technology Officer, Chief Data Officer, Senior Agency Official for Privacy, Chief Information Security Officer, and Program Manager.

[35] Code.gov will be modeled after Data.gov (https://www.data.gov) and Project Open Data (https://project-open-data.cio.gov/).

and to provide transparency into custom-developed code that is developed using Federal funds. This discoverability portal will be publically accessible and searchable via a variety of fields and constraints, such as the name of the project, its intended use, and the agency releasing the source code. Code.gov will evolve over time as a community resource to facilitate the adoption of good custom source code development, sharing, and reuse practices.

## 7.4 Code Repositories

Accessible, buildable, version-controlled repositories for the storage, discussion, and modification of custom-developed code are critical to both the Government-wide reuse and OSS pilot program sections of this policy. Agencies should utilize existing code repositories and common third-party repository platforms as necessary in order to satisfy the requirements of this policy.[36] Code.gov will contain additional information on this topic.

## 7.5 Licensing

Licensing is a critical component of OSS and can affect how the source code can be used and modified. Accordingly, when agencies release custom-developed code as OSS, they shall append appropriate OSS licenses to the source code. Additional information on licensing will be available on Code.gov.

## 7.6 Agency Policy

Within 90 days of the publication date of this policy, each agency's CIO—in consultation with the agency's CAO—shall develop an agency-wide policy that addresses the requirements of this document. For example, the policy should address how the agency will ensure that an appropriate alternatives analysis has been conducted before considering the acquisition of an existing commercial solution or a custom-developed solution. In accordance with OMB guidance,[37] these policies will be posted publicly. Moreover, within 90 days of the publication date of this policy, each agency's CIO office must correct or amend any policies that are inconsistent with the requirements of this document, including the correction of policies that automatically treat OSS as noncommercial software.

## 7.7 Accountability Mechanisms

Progress on agency implementation of this policy will be primarily assessed by OMB through an analysis of each agency's internal Government repositories, public OSS repositories, and code inventories on Code.gov, as well as data obtained through the quarterly Integrated Data

---

[36] Covered agencies should ensure access to these services. *See M-10-23: Guidance for Agency Use of Third-Party Websites and Applications,* Office of Mgmt. & Budget, Exec. Office of the President, June 25, 2010. https://www.whitehouse.gov/sites/default/files/omb/assets/memoranda_2010/m10-23.pdf.

[37] *See M-15-14: Management and Oversight of Federal Information Technology,* Office of Mgmt. & Budget, Exec. Office of the President, June 10, 2015. https://www.whitehouse.gov/sites/default/files/omb/memoranda/2015/m-15-14.pdf. This requires that IT policies be posted publicly at https://[agency].gov/digitalstrategy, and included as a downloadable dataset in the agency's Public Data Listing.

Collection (IDC), quarterly PortfolioStat sessions, the IT Dashboard, and additional mechanisms to be provided via Code.gov.[38]

---

[38] PortfolioStat is the core oversight tool used by OFCIO to improve both the efficiency and effectiveness of Federal IT. PortfolioStat's principle objectives are to serve as an overview of each agency's portfolio of IT investments and to oversee execution of OFCIO and OMB-wide policy. For information on the IT Dashboard, see https://itdashboard.gov/.

## Appendix A: Definitions

**Agency:** For the purposes of this policy, an agency is one that meets the definition of executive agency under the Clinger Cohen Act of 1996. *See* 41 U.S.C. § 11101.

**Code.gov**: This platform is primarily intended to serve two distinct functions. First, it will act as an online collection of tools, guides, and best practices specifically designed to help agencies implement the framework presented in this policy. Second, it will serve as the primary discoverability portal for custom-developed code intended both for Government-wide reuse and for potential release as OSS. Code.gov is not intended to house the custom-developed code itself; rather, it is intended to serve as a tool for discovering custom-developed code that may be available for Government-wide reuse or as OSS, and to provide transparency into custom-developed code that is developed using Federal funds. This discoverability portal will be publically accessible and searchable via a variety of fields and constraints, such as the name of the project, its intended use, and the agency releasing the source code. Code.gov will be accessible at https://www.code.gov and will evolve over time as a community resource to facilitate the adoption of good custom source code development, sharing, and reuse practices.

**Custom-Developed Code:** For the purposes of this policy, custom-developed code is code that is first produced in the performance of a Federal contract or is otherwise fully funded by the Federal Government. It includes code, or segregable portions of code, for which the Government could obtain unlimited rights under Federal Acquisition Regulations (FAR) Pt. 27 and relevant agency FAR Supplements. Custom-developed code also includes code developed by agency employees as part of their official duties. For the purposes of this policy, custom-developed code may include, but is not limited to, code written for software projects, modules, plugins, scripts, middleware, and APIs; it does not, however, include code that is truly exploratory or disposable in nature, such as that written by a developer experimenting with a new language or library.

**Mixed Source Software**: A mixed source software solution incorporates both open source and proprietary code.

**Open Source Software (OSS)**: Software that can be accessed, used, modified, and shared by anyone. OSS is often distributed under licenses that comply with the definition of "Open Source" provided by the Open Source Initiative (https://opensource.org/osd) and/or that meet the definition of "Free Software" provided by the Free Software Foundation (https://www.gnu.org/philosophy/free-sw.html).

**Proprietary Software**: Software with intellectual property rights that are retained exclusively by a rights holder (*e.g.*, an individual or a company).

**Software**: Refers to (i) computer programs that comprise a series of instructions, rules, routines, or statements, regardless of the media in which recorded, that allow or cause a computer to perform a specific operation or series of operations; and (ii) recorded information comprising source code listings, design details, algorithms, processes, flow charts, formulas, and related

14

material that would enable the computer program to be produced, created, or compiled. Software does not include computer databases or computer software documentation.[39]

**Source Code**: Computer commands written in a computer programming language that is meant to be read by people. Generally, source code is a higher level representation of computer commands as they are written by people and, therefore, must be assembled or compiled before a computer can execute the code as a program.

---

[39] As "computer software" is defined in 48 C.F.R. § 2.101. https://www.gpo.gov/fdsys/pkg/CFR-2002-title48-vol1/pdf/CFR-2002-title48-vol1-sec2-101.pdf.

Exhibit 3

# Risk Analysis for the Public Release of e-QIP Source Code

## Introduction

This is a risk assessment performed within the framework of NIST Special Publication 800-30, Guide for Conducting Risk Assessments. It is intended to supplement a legal declaration prepared for a Freedom of Information Act lawsuit seeking the public disclosure of software source code developed by the Federal government.

## Step 1: Prepare for the Assessment
### Task 1-1: Identify Purpose

*Identify the purpose of the risk assessment in terms of the information that the assessment is intended to produce and the decisions the assessment is intended to support.*

The intent of this risk assessment is to evaluate the level of risk[1] associated with releasing the source code to the Office of Personnel Management's e-QIP web application to an individual in the general public (and, presumably by extension, the entire public). It is intended to assist a Federal District Court in making its determination as to the degree of risk associated with granting the Plaintiff's request.

This risk assessment does not evaluate the absolute risk of operation of e-QIP; rather, it considers the relative change in risk of the proposed change in the disclosure status of the e-QIP source code. It will indicate whether the risk is expected to increase, decrease, or remain the same.

The difference in risk between the two scenarios is expected to be reflected primarily in Task 2-4, where the likelihood of a successful attack is discussed. Thus, except as noted, all of the risk data identified prior to Task 2-4 is expected to remain constant regardless of the availability of the e-QIP source code to the general public.

### Task 1-2: Identify Scope
*Identify the scope of the risk assessment in terms of organizational applicability, time frame supported, and architectural/technology considerations.*

This risk assessment is specific to the Office of Personnel Management and its e-QIP system. There is no specific time frame, and no specific architectural/technology considerations.

It is important to note that web application vulnerabilities are by no means the only manner of compromising information systems. Vulnerabilities can abound in the various infrastructure components

---

[1] SP 800-30 evaluates risk in the context of potential adverse impacts to "organizational operations and assets, individuals, other organizations, and the Nation."

supporting the web application, including web application frameworks, web servers, and operating systems. None of these components (and by extension, none of their associated vulnerabilities) would change if the e-QIP source code was released, and thus the primary area of focus is in the web application itself.

## Task 1-3: Identify Assumptions and Constraints
*Identify the specific assumptions and constraints under which the risk assessment is conducted.*

The risk assessment is being performed based on publicly available information, based on general principles and information security industry standard best practices. There may be considerations which are not publicly known that affect this risk analysis, although this is considered relatively unlikely.

Various aspects of threat and vulnerabilities must be assumed. In keeping with the principles of prudence, where an assumption cannot be made with reasonable certainty, the more pessimistic assumption will be used.

A notable exception to this pessimistic assumption is that it is assumed that there are no material vulnerabilities in the effectiveness of the user authentication and session handling capabilities of e-QIP. This is for simplicity of the risk analysis, as a failure of these security controls would cause major impacts regardless of the availability of the source code of e-QIP.

This risk assessment only considers adversarial threats. Non-adversarial threats (such as natural disaster or human error) are not in scope.

## Task 1-4: Identify Information Sources
*Identify the sources of descriptive, threat, vulnerability, and impact information to be used in the risk assessment.*

Given the nature of this risk assessment, threat and vulnerability information must be generally assumed. Impact information is widely available given the recent breaches of the e-QIP system.

## Task 1-5: Identify Risk Model and Analytic Approach
*Identify the risk model and analytic approach to be used in the risk assessment.*

Given the lack of quantitative data, this risk assessment will utilize a qualitative scale following the 5x5 scale provided in NIST SP 800-30. The qualitative values will be assigned based on the descriptive text in the appropriate tables in the appendices of SP 800-30.

# Step 2: Conduct the Assessment

## Task 2-1: Identify Threat Sources
*Identify and characterize threat sources of concern, including capability, intent, and targeting characteristics for adversarial threats and range of effects for non-adversarial threats.*

The primary threat sources to the e-QIP system to be considered when assessing the proposal to release the e-QIP source code are adversarial in nature and may be individuals, outsiders, ad hoc or established groups, or nation-states. Assuming the "worst-case scenario" of threat characteristics that are likely to apply to e-QIP:

Capability
The threat has a very sophisticated level of expertise, is well-resourced, and can generate opportunities to support multiple successful, continuous, and coordinated attacks. [Table D-3 qualitative value: "Very High"]

Intent
The threat actively seeks to obtain critical or sensitive information (ostensibly the data managed by an active instance of the e-Qip system, which has already been publicly compromised). [Table D-4 qualitative value: "Low"]

Targeting
The threat uses publicly available information (in this case, the presupposed released e-Qip source code) to target a class of high-value information. [Table D-5 qualitative value: "Moderate"]

## Task 2-2: Identify Threat Events
*Identify potential threat events, relevance of the events, and the threat sources that could initiate the events.*

This highly capable and moderately motivated adversary may perform reconnaissance and craft an attack on an operational instance of the e-QIP system in order to obtain sensitive information.

## Task 2-3: Identify Vulnerabilities and Predisposing Conditions
*Identify vulnerabilities and predisposing conditions that affect the likelihood that threat events of concern result in adverse impacts.*

e-QIP's persistent connectivity to the Internet predisposes it to arbitrary probes and attacks which cannot be reasonably thwarted. However, the pervasiveness of the exposure is limited: Most of the user-facing code for e-QIP requires an authenticated user (and the authentication mechanisms are assumed to be properly functioning).

## Task 2-4: Identify Likelihood
*Determine the likelihood that threat events of concern result in adverse impacts, considering: (i) the characteristics of the threat sources that could initiate the events; (ii) the vulnerabilities/predisposing conditions identified; and (iii) the organizational susceptibility reflecting the safeguards/countermeasures planned or implemented to impede such events.*

### Likelihood of Threat Event Initiation
An adversary is almost certain to initiate a threat event, regardless of the availability of the source code of e-QIP. It is a noted predisposing condition that e-QIP is an Internet-exposed web application which, like virtually all publicly available web applications, is under constant probing by threat sources already.

This is supported by the Declaration of Lawrence W. Anderson, where in paragraph 28 he states: "OPM including the background investigations systems are the target of continuous unauthorized access attempts throughout the year." The availability of the e-QIP source code would not be expected to make a significant difference in already pervasive threat events. [Table G-2 qualitative value: "Very High"]

### Likelihood of Threat Event Resulting in Adverse Impacts

"Likelihood of threat event resulting in adverse impacts" basically means: "If an attacker attacks, how likely are they to succeed?"

In SP 800-30 Table G-4, NIST provides 5-level qualitative scale used for assigning qualitative values to the likelihood of the threat event resulting in adverse impacts. The table is reproduced below (omitting quantitative scales for clarity since they are not being used):

| Qualitative Values | Description |
|---|---|
| Very High | If the threat event is initiated or occurs, it is **almost certain** to have adverse impacts. |
| High | If the threat event is initiated or occurs, it is **highly likely** to have adverse impacts. |
| Moderate | If the threat event is initiated or occurs, it is **somewhat likely** to have adverse impacts. |
| Low | If the threat event is initiated or occurs, it is **unlikely** to have adverse impacts. |
| Very Low | If the threat event is initiated or occurs, it is **highly unlikely** to have adverse impacts. |

As noted previously, e-QIP is under constant attack. Given the relative rarity of breaches of the system (at least, that had a sufficient impact as to motivate OPM to announce the breach publicly), it is fair to say that, as it stands, the outcome of threat events are "unlikely" to have adverse impacts.

The key question is whether or not the availability of the e-QIP software is likely to increase the effectiveness of the already pervasive attacks from "unlikely" to "somewhat likely" or higher. This is the only change that would potentially result in a net change in calculated risk utilizing the government-standard risk management methodology.

The change in likelihood is a function of two considerations: Any expected increase in the effectiveness of attacks due to the ability of attackers to scrutinize the e-QIP source code, and any expected decrease in the effectiveness of attacks due to the effect of public scrutiny on the e-QIP source code.

As to the possibility of an increase in effectiveness, it is noted that most web application vulnerabilities are failures to properly sanitize user input. Identification of these vulnerabilities can be done in two ways (or, more typically, some combination of both): Black-box testing, typically utilizing tools designed for identifying web application vulnerabilities (e.g., Netsparker, Acunetix, OWASP ZAP, IBM AppScan), and source code inspection. Either methodology is generally effective for identifying the existence of common web application vulnerabilities, although each has its own efficiency advantages. In particular, constructing a useful exploit with an identified vulnerability is more efficient when there is access to the source code; however, this is mostly just a function of efficiency and not effectiveness. It is self-evident that when using two different methodologies which produce different results, using both methodologies

will produce no fewer results than either individual methodology, and will possibly produce more results. Based on experience with web application testing, one would expect the difference to be relatively small, and largely a function of the amount of time available to perform testing. This is especially true given the identified characteristics of the relevant threat: A well-resourced, motivated attacker. Given the characteristics of the identified threat sources, one would expect at best a minor increase in effectiveness.

As to the possibility of a decrease in effectiveness, this is largely a function of effective public scrutiny by motivated, capable, and benevolent individuals. The concept of "many eyes make bugs shallow" is often repeated in the open source community; however, this is not always as effective in practice as it may seem in principle. There are many examples of high-profile software having critical bugs that were overlooked for years in both the open-source and closed-source software ecosystems, making it clear that the possibility of public scrutiny alone is not sufficient – there must be motivated, capable, and benevolent individuals actually performing the analysis and providing feedback. e-QIP is a unique case that one could well expect to develop this community. Within e-QIP are the personal details of millions of people, a substantial number of whom are information security professionals with strong expertise in information security. Given the recent large-scale security breaches at OPM, it is not unreasonable to expect some significant number of these capable individuals to take the opportunity to audit the e-QIP software to help protect their personal information. It is also common for security enthusiasts to audit high-profile software in an effort to achieve recognition. Government agencies often receive "tips" from benevolent strangers on the Internet who have identified vulnerabilities. Given these considerations, one could reasonably expect at least a minor decrease in vulnerabilities in the e-QIP code, thus affording at least a minor reduction in the effectiveness of the attacks of threat actors.

Given these two considerations, one could reasonably expect the net effects to offset or represent only a minimal change to the likelihood of a threat event resulting in adverse impacts. To the extent that either of these factors would outweigh the other, the change in likelihood would almost certainly not move from "unlikely" to "somewhat likely" or "highly unlikely".

## Overall Likelihood

In both scenarios, the overall likelihood remains the same. Given a "Very High" likelihood of initiation, and a "Low" likelihood of adverse effects, the overall likelihood is "Moderate", based on the 5x5 assessment matrix in SP 800-30 Table G-5.

## Task 2-5: Determine Impact

*Determine the adverse impacts from threat events of concern considering: (i) the characteristics of the threat sources that could initiate the events; (ii) the vulnerabilities/predisposing conditions identified; and (iii) the susceptibility reflecting the safeguards/countermeasures planned or implemented to impede such events.*

When considering the effects of a threat source successfully carrying out a threat event, let us assume for the purposes of this exercise that there will be:

- Harm to the responsible agency's operations in the form of:
    - Damage to trust relationships. Presumably, between the responsible agency and the American public.
    - Damage to image or reputation of the responsible agency.
- Direct financial costs. Presumably, in the form of provision of resources to protect individuals affected by a breach of confidentiality of sensitive information.
- A limited adverse effect on individuals resulting in minor harm. Presumably, as the availability of resources to protect people following a breach of sensitive information is prevalent, and as a breach subsequent to those of recently publicized compromises could not possibly be as severe.

This would represent, at most, a "severe or catastrophic adverse effect on organizational operations, organizational assets, individuals, other organizations, or the Nation". [Table H-3 qualitative value: "High"]

(Note: One could reasonably argue the impact is "Moderate"; for this risk assessment, a pessimistic view is taken)

## Task 2-6: Determine Risk

*Determine the risk to the organization from threat events of concern considering: (i) the impact that would result from the events; and (ii) the likelihood of the events occurring.*

Given the overall likelihood of "Moderate" and the impact of "High", the overall risk based on the level of risk assessment scale in Table I-2 of SP 800-30 is "Moderate"[2].

As discussed in the "Likelihood" section, the assigned value for "overall likelihood" would not be expected to differ between the baseline scenario of secret e-QIP software and the release of e-QIP software. Therefore, when following the Federal government standard IT risk management methodology in NIST SP 800-30, there does not appear to be a significant risk to the release of the e-QIP software.

---

[2] As noted previously, this is based on a pessimistic view of risk and one could potentially reasonably argue some factors such as "impact" down to reflect a lower overall risk (although the major breach last year clearly indicates that a significant level of risk is indeed present). In such a case, the overall risk would remain the same for both scenarios compared in this risk assessment.