UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONALD L. SHERIDAN, JR [Pro Se], ) | |
| ) | |
| Plaintiff ) | CASE NUMBER: 16-cv-00805 (KBJ) |
| ) | |
| vs. ) | |
| ) | |
| U.S. OFFICE OF PERSONNEL MANAGEMENT ) | |
| ) | |
| Defendant ) | |

PLAINTIFF'S REPLY IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

The Defendant's Opposition and Reply Memorandum ("Def.'s Opposition and Reply") fails to justify Defendant's claimed exemptions and fails to demonstrate a fulfillment of Defendant's responsibilities in searching for responsive records and segregating non-exempt portions of records.

The Defendant's arguments variously refer to the e-QIP source code itself, completed investigative forms, and completed background investigations; confusingly, the distinction between these is not often made clear in Defendant's arguments. The Defendant also variously implies functionality of e-QIP and the presence of records stored in OPM's production e-QIP system that are not supported by the Defendant's description of the responsive records. Plaintiff attempts to untwist these concepts below to ensure a clear understanding of terminology, as well as a clear understanding of the capabilities of the e-QIP system as described by the Defendant.

The Defendant describes e-QIP in the section entitled "Description of Records Responsive to Plaintiff's Request", which comprises paragraphs 14-19 of the Anderson Declaration attached to

RECEIVED
JAN 17 2017
Clerk, U.S District & Bankruptcy
Courts for the District of Columbia

Defendant's Motion for Summary Judgment. It is notable that this description includes only the collection of information on forms that were previously only available on paper (referred to herein as "investigative forms" when referencing the concept of a "blank" form), the storage of those completed forms (referred to herein as "completed investigative forms" when referencing the concept of a "filled-in" form), the ability of an individual to update their competed investigative forms, the ability to "transmit" the completed investigative forms (presumably to the requesting agency), and the ability of OPM and the agencies requesting the background investigations to access the completed investigative forms. As described, these functions essentially replace a paper-based system of collecting data elements which, by virtue of the public availability of the paper investigative forms that e-QIP replaces, are well-known (Anderson Decl. ¶25).

It is notable that this description does not indicate that e-QIP stores any information beyond that which is filled out by the background investigation applicant. In particular, this description does not indicate that e-QIP stores any information gathered by OPM in the course of conducting a background investigation. The description of the functional goal of e-QIP supports this interpretation: "The objective of the acquisition was the development for OPM of a secure web-based system that would allow individuals to complete the appropriate investigative form and transmit the data through the requesting Government agency to OPM's central computer system."

Based on this description, e-QIP itself performs no functions beyond those necessary to collect and manage the information entered by applicants on investigative forms, and stores no data beyond completed investigative forms. In particular, it does not store completed background investigations (referred to herein as "completed background investigations" when referencing the concept of data collected in the course of performing a background investigation beyond that which was supplied by the applicant completing the investigative form.)

Under the Freedom of Information Act, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency proves that it has fully discharged its FOIA obligations is summary judgment appropriate. 5 U.S.C.A. § 552; *Beveridge & Diamond, P.C. v. United States Department of Health and Human Services*, 85 F. Supp. 3d 230 (D.D.C. 2015). As shown in Plaintiff's Motion for Summary Judgment and this Reply in Support of Plaintiff's Cross-Motion for Summary Judgment, the Defendant has failed to meet this burden of proof. As such, Plaintiff's Motion for Summary Judgment should be granted.

## ARGUMENT

### I.  OPM DID NOT DEMONSTRATE THAT IT CONDUCTED A REASONABLE SEARCH

Plaintiff believes that his arguments to date are sufficient, generally denies the arguments made by the Defendant in Def.'s Opposition and Reply, and re-asserts the arguments made in Plaintiff's Motion for Summary Judgment.

### II.  OPM DID NOT PROPERLY APPLY EXEMPTIONS 2 AND 7(E)

#### A. OPM DID NOT PROPERLY APPLY EXEMPTION 7(E)

OPM maintains that the records sought by Plaintiff are exempt under FOIA Exemption 7(E), which allows an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." (5 U.S.C. § 552(b)(7)(E)) OPM has yet to identify with specificity any "techniques and procedures" that would be disclosed by the release of the e-QIP source code, and OPM's description of e-QIP in paragraphs 14-19 of the Anderson Declaration describes neither any

functionality of e-QIP that would implement such techniques and procedures nor any records stored in the production e-QIP system operated by OPM ("OPM's production e-QIP") that would contain such techniques and procedures.  OPM does state in various ways that OPM's production e-QIP system stores sensitive information, which Plaintiff does not dispute.  This is immaterial, however, for two reasons.  First, the legal standard for a 7(E) exemption is "techniques and procedures for law enforcement investigations", not simply sensitive information (e.g., an applicant's social security number or medical history).  Second, Plaintiff has not requested these records; Plaintiff seeks the source code and operational documentation of the system that collects, stores, and manages completed investigation forms, not the completed investigative forms themselves that are stored in OPM's production e-QIP system.

In Def.'s Opposition and Reply, Defendant asserts that complying with the Plaintiff's FOIA request (i.e., the release of the e-QIP source code and its related design documentation) would disclose "techniques and procedures used for law enforcement investigations" (quoting 5 U.S.C. § 552(b)(7)(E)).  The Defendant further states that the risk is the disclosure of "information pertain[ing] to security clearance procedures, the disclosure of which could render those procedures vulnerable to circumvention."  The Defendant, however, does not clearly state the exactly where those procedures exist; thus, Plaintiff infers two possibilities based on the arguments made by Defendant.  First, it is possible that the Defendant is asserting that those techniques and procedures are directly stored in the records that are sought by this lawsuit.  That is to say, the Defendant appears to be claiming that the "techniques and procedures used for law enforcement investigations" are an inherent part of e-QIP itself.  Second, it is possible that the Defendant is asserting that those techniques and procedures are in the records that are stored by OPM's production e-QIP.  For clarity, each of these cases will be addressed separately.

1. **TECHNIQUES AND PROCEDURES IN THE SOURCE CODE**

The Defendant has yet to demonstrate any functionality of e-QIP that is a technique or procedure used for law enforcement investigations that would reasonably risk harm in disclosure. If, for example, e-QIP were to extract a list of foreign contacts from all of the submitted investigation forms and use a machine learning algorithm to attempt to identify foreign contacts that are likely to be engaged in espionage, such a capability might rise to the level of a technique or procedure that could potentially risk harm by disclosure. However, as noted previously, the description of e-QIP provided by the Defendant in the section entitled "Description of Records Responsive to Plaintiff's Request" in the Anderson declaration makes no mention of the implementation of any investigatory process, or for that matter any function of e-QIP that would meet with this description. (Anderson Decl. ¶¶14-19) Rather, e-QIP's functionality is described as collecting information from applicants via electronic versions of investigative forms and making that information available to various parties. In particular, no e-QIP functionality is described that would be used to evaluate the applicant's submitted information or execute any process designed to actually adjudicate the clearance request. Because no functionality in e-QIP that could be described as a "technique" or "procedure" for "law enforcement purposes", Exemption 7(E) cannot reasonably apply to the e-QIP source code itself. OPM therefore has failed to demonstrate the applicability of Exemption 7(E) to the case of techniques and procedures in the e-QIP source code.

2. **TECHNIQUES AND PROCEDURES IN THE STORED RECORDS**

There are two questions at issue in the discussion in this section. First, will the disclosure of the e-QIP source code increase the risk of a malicious actor compromising the OPM production e-QIP and obtaining the records stored therein? Second, would a compromise of the records stored in e-QIP provide a malicious actor with techniques and procedures used for law enforcement investigations sufficient to warrant a 7(E) exemption?

To address the question of whether the release of the e-QIP source code would increase the risk of successful compromise of the OPM production e-QIP, Plaintiff included a risk assessment that utilized the government-standard risk assessment methodology in his Motion for Summary Judgment. (Ex. 3 to Said Decl., Risk Assessment) The risk assessment concluded that "there does not appear to be a significant risk to the release of the e-QIP software."

In Def.'s Opposition and Reply, OPM cites this risk assessment, stating that "Plaintiff's own assessment concludes that there is at least a 'Moderate' increase in the likelihood of a threat event to result from the disclosure of e-QIP source code and that such a threat event would be 'highly likely' to have adverse impacts." This sentence grossly misuses terms of art in government-standard IT risk management, and as such is essentially meaningless in that context. These terms of art are defined in NIST Special Publication 800-30, and as an operator of a federal information system, the Defendant should be intimately familiar with standard government risk assessment terminology and methodologies, as they are generally required for use in Federal government (Said Decl. ¶22). This misuse of terminology and concepts conveys improper conclusions.

The risk assessment clearly made its purpose known: "[The risk assessment] considers the relative change in risk of the proposed change in the disclosure status of the e-QIP source code. It will indicate whether the risk is expected to increase, decrease, or remain the same."

Defendant claims that the risk assessment "concludes that there is at least a 'Moderate' increase in the likelihood of a threat event to result from the disclosure of e-QIP source code". The risk assessment did not determine that there is a "Moderate" risk of releasing the e-QIP source code. This is directly contravened by the final paragraph of the risk assessment which summarized the findings:

> As discussed in the "Likelihood" section, the assigned value for "overall likelihood" would not be expected to differ between the baseline scenario of secret e-QIP software and the release of e-QIP software. Therefore, when following the Federal government standard IT risk management

methodology in NIST SP 800-30, there does not appear to be a significant risk to the release of the e-QIP software.

The risk assessment determined that e-QIP is currently operating with "Moderate" overall risk, and that the disclosure of the e-QIP source code would not likely alter the overall "Moderate" risk. In Def.'s Opposition and Reply, the Defendant claims that "OPM has previously been the subject of cyber-intrusions that impacted background investigation records similar to the information contained in the e-QIP system." This admission by OPM supports the conclusion of the risk assessment that OPM is currently operating with "Moderate" risk, as OPM has been unable to prevent multiple intrusions into its computer systems. These compromises occurred without the attacker having access to the e-QIP source code, supporting the conclusion that source code secrecy does not provide adequate protection against compromises. (See also Said Decl. ¶19)

The Defendant states that "Plaintiffs own assessment concludes that there is at least a 'Moderate' increase in the likelihood of a threat event to result from the disclosure of e-QIP source code and that such a threat event would be 'highly likely' to have adverse impacts." Aside from the incorrectness of the "Moderate" rating previously discussed, there are several issues with this sentence. First, the risk assessment clearly states that there is no change in the likelihood of threat event initiation, stating: "An adversary is almost certain to initiate a threat event, regardless of the availability of the source code of e-QIP." Second, the risk assessment indicates that with respect to the baseline scenario of undisclosed e-QIP source code: "it is fair to say that, as it stands, the outcome of threat events are 'unlikely' to have adverse impacts." When considering whether the effects of the release of the e-QIP source code would make attackers any more successful in attacking OPM's production e-QIP system, the risk assessment discusses the various factors that might increase or decrease an attacker's success, and concludes that "one could reasonably expect the net effects to offset or represent only a minimal change to the likelihood of a threat event resulting in adverse impacts. To the extent that either of these factors would

outweigh the other, the change in likelihood would almost certainly not move from 'unlikely' to 'somewhat likely' or 'highly unlikely'." Finally, in no place does the risk assessment state that any "threat event would be 'highly likely' to have adverse impacts"; in fact, nowhere does the risk assessment state that anything is "highly likely" (The phrase "highly likely" only appears in a table that is reproduced verbatim from NIST SP 800-30).

Defendant takes issue with the risk assessment failing to use the FOIA legal term of art "reasonable", instead nothing that the risk does not appear to be "significant"; however, it is not the function of a risk assessment to make a legal argument. Rather, the scope of the risk assessment is simply to determine if OPM's production e-QIP system is more likely to be compromised if the e-QIP source code were released to the public. Regardless, it is not the Plaintiff's burden to show that the risk of circumvention of the law is unreasonable; it is the burden of the Defendant to show that the risk is reasonable, and the Defendant has not met this burden. In fact, the Defendant's assertion of risk is unreasonable. Asserting the existence risk when a standard risk assessment methodology shows "there does not appear to be a significant risk" is not reasonable, particularly when the Defendant does not offer any substantive corrections to the risk assessment. Plaintiff contends that Defendant's reliance on vague assertions of risk rather than conducting their own formal risk assessment is not reasonable. OPM's gross misinterpretation of a basic, government-standard risk assessment casts doubt on OPM's ability to adequately conduct its own risk assessment to arrive at a reasonable determination of risk.

Plaintiff therefore contends that the risk assessment plainly answers the question of whether or not the disclosure of the e-QIP source code increases the risk of a malicious actor compromising the OPM production e-QIP and obtaining the records stored therein.

FOIA's Exemption 7(E), does not apply generally to the risk of information compromise in general (even sensitive privacy information such as the information collected by OPM); it applies specifically to

the risk of disclosure of "techniques and procedures for law enforcement investigations or prosecutions, or [disclosure of] guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law". As such, the legal question is not just whether or not the release of the e-QIP source code would increase the likelihood of a compromise of OPM's production e-QIP, but whether such a compromise would disclose the specifically exempt techniques and procedures.

In Def.'s Opposition and Reply, OPM only generally describes the harm of disclosure of the records stored in e-QIP as allowing a malicious party access to a "repository for a vast and rich volume of information that is highly sensitive to the law enforcement purposes served by OPM's background investigations responsibilities." This description of harm merely recognizes that the OPM production e-QIP system houses sensitive information[1], but sensitive information alone is not the Exemption 7(E) standard. Even if access to the e-QIP source code increased the risk of a compromise of the OPM production e-QIP system, OPM still has not demonstrated that the records stored within that system include **any** techniques and procedures, thus not demonstrating the existence of techniques and procedures used for law enforcement investigations, and thus not demonstrating the existence of techniques and procedures for law enforcement investigations that would reasonably be expected to risk circumvention of the law. As noted previously, based on the Defendant's description of the responsive records, e-QIP itself performs no functions beyond those necessary to collect and manage the information entered by applicants on investigative forms, and stores no data beyond completed investigative forms. In particular, it does not store completed background investigations. (Anderson Decl. ¶¶14-16)

---

[1] The Plaintiff, being a user of e-QIP and thus, a recipient of a breach notice from OPM last year, does not dispute that there is sensitive information stored in e-QIP.

OPM has therefore not demonstrated that the nature of the information collected and stored by OPM's production e-QIP system meets the standard of risk for a 7(E) exemption. Because the investigative forms are publicly available (Anderson Decl. ¶25), compromising OPM's production e-QIP system to examine the completed forms do not plausibly provide any insight into the techniques and procedures used for law enforcement investigations.

OPM has failed to demonstrate that the disclosure of the e-QIP source code and related documentation would result in an elevated risk of compromise of OPM's production e-QIP system. OPM has further failed to demonstrate that such a compromise would disclose information that would meet the standard of harm in Exemption 7(E). OPM therefore has failed to demonstrate the applicability of Exemption 7(E) to the case of techniques and procedures in the records stored by OPM's production e-QIP system.

In Def.'s Opposition and Reply, Defendant claims that Plaintiff "misunderstands the relevance of Mittleman to Defendant's argument" in response to Plaintiff's observation in his Motion for Summary Judgment that "Mittleman addressed background investigation information itself, not the tools or processes that support the background investigation process." Defendant continues to not draw a distinction between the completed background investigations, the completed investigative forms, and the source code of the system that is used to collect the completed background forms.

Defendant claims that they "cited Mittleman to establish that OPM's background investigatory function is subject to Exemption 7 of FOIA". But again, Mittleman referred to the completed background investigations; the Court's conclusion in this specific case was "that OPM's background investigation information was compiled for 'law enforcement purposes'". Plaintiff does not argue (and has not argued) that some of the information collected in the course of conducting a background investigation might pass the threshold test for law enforcement information. Thus, obviously the

"function" of conducting the background investigation can be, according to established precedent, a "law enforcement function". Plaintiff, rather, argues that *Mittleman* is not relevant for two reasons. First, it is not relevant to the functions performed by e-QIP, as e-QIP is not used to actually conduct the background investigation. As noted previously, based on the Defendant's description of the responsive records, e-QIP itself performs no functions beyond those necessary to collect and manage the information entered by applicants on investigative forms, and stores no data beyond completed investigative forms. In particular, it does not store completed background investigations, nor does it perform any adjudication functions on the completed investigative forms. (Anderson Decl. ¶¶14-16) Because the only information stored by e-QIP is the information that is supplied by the applicant, it is self-evident that *Mittleman* does not apply. As such, *Mittleman* is not sufficient to meet the law enforcement purpose threshold. The burden is on OPM to demonstrate a nexus between the asserted law enforcement function and the records in question. *Pratt v. Webster*, 673 F.2d 408, 419-21 (D.C. Cir. 1982) OPM has not met this burden.

OPM disputes the applicability of the OMB memorandum included in Plaintiff's Motion for Summary Judgment (Ex. 2 to Said Decl., OMB Memorandum 16-21) to the e-QIP system. Plaintiff does not make (and has not made) any representation that Defendant is bound to follow the requirements outlined in the OMB Memo, nor that the OMB Memo supersedes any FOIA exemption. Plaintiff included the memo for several reasons, among them to demonstrate the Federal government's general policy on the release of source code, to demonstrate that the Federal government recognizes a public interest in the release of source code developed by and for the Federal government, and to give some context on the benefits and drawbacks of releasing source code.

As demonstrated above, OPM has failed to meet its burden of proof for its Exemption 7(E) claim. OPM has not identified either a function of e-QIP nor information stored in OPM's production e-QIP

system that contains a technique or procedure for law enforcement investigations, and thus, failed to demonstrate that the release of the requested records would reasonably be expected to risk circumvention of the law.

### B. OPM DID NOT PROPERLY APPLY EXEMPTION 2

OPM claims that the records sought by Plaintiff are also exempt under FOIA Exemption 2, which allows an agency to withhold records "related solely to the internal personnel rules and practices of an agency." (5 U.S.C. § 552(b)(2)) This assertion is incorrect.

As previously noted in Plaintiff's Motion for Summary Judgment, OPM conflates the concept of "rules and practices" with the underlying administrative tools used to support those activities. OPM claims that there is no public interest in releasing the source code to e-QIP or its associated manuals, likening the requested records to portions of a U.S. Marshall's Manual as discussed in *Cox v. DOJ*, 602 F.2d 1, 5 (D.C. Cir. 1979). As noted in Plaintiff's Motion for Summary Judgment, this comparison is not apt: In the case of source code, it is well recognized that source code can be re-used, re-purposed, and improved (Said Decl. ¶¶ 6-7). The source code is not documentation of the "rules and practices" of OPM, it is a tool that can be applied to various tasks (albeit with some necessary modifications), only one of which is OPM's task. As such, Exemption 2 does not apply because the requested records do not relate to the internal personnel rules and practices of OPM.

Even if the requested records did relate to the internal rules and practices of OPM, relating to personnel decisions is not sufficient to meet the burden of Exemption 2; "[e]xemption 2 does not generally apply to matters…in which there is a genuine and important public interest." *Department of Air Force v. Rose*, 425 U.S. 352 (1976) OPM asserts that "there is no legitimate public interest in that information that Plaintiff has identified"; however, Plaintiff provided a substantial statement on the public interest of the release of the requested information in his Motion for Summary Judgment as well

as in the Declaration of Karim A. Said. Plaintiff cited the Federal government's policy on source code re-use as documented in OMB Memorandum 16-21 (Ex. 2 to Said Decl., OMB Memorandum 16-21), which recognizes the public benefits of source-code disclosure.

Defendant characterizes Plaintiff's description of the functions performed by e-QIP as "relatively uninteresting mundane administrative tasks" (and thus, by implication, subject to Exemption 2), but this quote is taken out of context. This quote was from Plaintiff's argument about Exemption 7(E). The word "relatively" is contrasting the functions performed actually performed by e-QIP (as described by the Defendant in the Lawrence Declaration) to functions that would meet the standard of "techniques and procedures for law enforcement investigations" (such "CSI-esque" functions being relatively exciting).

Defendant states that "[t]he information requested by Plaintiff concerns how the applicant and background investigation information is stored and processed within OPM for the purposes of making personnel decisions, thus meeting the requirements of Exemption 2 of FOIA." As noted previously, simply relating to personnel decisions is not sufficient to meet the burden of Exemption 2; "[e]xemption 2 does not generally apply to matters…in which there is a genuine and important public interest." *Department of Air Force v. Rose*, 425 U.S. 352 (1976)

As it relates to Exemption 2, the tasks performed by e-QIP are not relevant to the value of the release of the source code. Defendant's objection is yet another example of the Defendant conflating the functions performed by e-QIP with the value of the source code of e-QIP which performs those functions. Computers, since their inception, have automated more and more routine tasks, providing clear value in this automation. Because OPM saw fit to develop e-QIP, there was obviously value to OPM in automating the previous manual, paper-based system of collecting and managing investigative form data. Substantial development work has been invested into the development of the e-QIP source

code. (Lawrence Decl. ¶¶16 & 18) The ability to re-purpose the code developed by OPM to automate similar functions elsewhere (including elsewhere in the Federal government) is clearly in the public interest; among other things it allows others to take advantage of this investment without duplicating design effort. Re-purposing software is not the only public value, there are myriad other ways in which source code disclosure benefits the public. For example, the software developers outside of OPM may improve upon the e-QIP code (including security improvements) and contribute those improvements back to OPM. (See Said Decl. ¶¶7-10) In fact, OPM itself appears to be benefitting from the use of open-source software in at least part of the infrastructure that supports the e-QIP system. (Said Decl. ¶9)

Defendant errs in their statement that "[b]ecause the premise of Plaintiff's argument in this regard is that the information is 'uninteresting' and 'mundane,' and thus of interest only internally within OPM, the memorandum cited by Plaintiff regarding the use of open-source software also is immaterial to the Exemption 2 issue." The OMB memorandum makes no representation on how "interesting" software should be to provide value in making the source code available.

As demonstrated above, OPM has failed to meet its burden of proof for its Exemption 2 claim. OPM has not demonstrated that the requested records relate solely to its internal personnel rules and practices. Plaintiff has demonstrated that the requested records do not relate to internal personnel rules and practices. Plaintiff has further demonstrated that, even if the requested records did relate to internal personnel rules and practices, that they do not relate solely to such rules and practices, and that there are multiple clear public benefits to releasing the requested records.

### C. SEGREGABILITY

OPM still has not demonstrated that it has met its segregability requirements. While segregability should not be applicable since OPM has failed to meet its burden of proof for exemption, to the extent

that any of the Defendant's exemption claims are upheld, Plaintiff disagrees that the records in question are not segregable.

In Def.'s Opposition and Reply, OPM cites *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977), which established that non-exempt portions of records need not be disclosed if they are "inextricably intertwined with exempt portions." As Plaintiff noted in his Motion for Summary Judgment, in order to demonstrate that all reasonably segregable material has been released, the agency must provide a "detailed justification" for its non-segregability. *Johnson v. Exec. Office for United States Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002) Mere conclusory statements can be inadequate to justify non-segregability, and statements can be considered conclusory "where no factual support is provided for an essential element of the claimed privilege or shield". *Jarvik v. CIA*, 741 F. Supp. 2d 106, 120 (D.D.C. 2010)

OPM refers to the paragraphs 34-35 of the Anderson Declaration in support for its claim of non-segregability. To the extent that the referenced paragraphs apply to the subjects of segregability, they consist entirely of conclusory statements, with no detailed justification, that the records are not segregable. Plaintiff contends that significantly more detail is necessary for the Defendant to meet their burden of proof. For instance, computer source code is generally organized in "functions", "procedures", or "methods", each of which generally perform a single specific task (e.g., a login function which processes a user's login request or a function to commit a user's completed form to a database). These functions are the building blocks on which computer software is built, and are generally re-usable across software applications. For example, the login function from one application may be re-purposed for another application. Such structure lends itself to segregability, and Defendant provides no justification as to why the source code cannot be segregated as such.

Defendant further cites *Mead Data*, noting that "a court may decline to order an agency to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content", but does not provide any concrete context as to resources that would be required to segregate the records, nor has it demonstrated that segregating the records would result in records with minimal or no information content. Additionally, because Plaintiff did not request a fee waiver, the Defendant should not imply that it is a foregone conclusion that the cost of conducting the segregation would be borne by the Defendant.

Defendant also relies on their claim that two exemptions apply completely to all requested records, essentially stating that to the extent that one exemption might not apply, the other does. This rationale obviously relies on Defendant's exemption claims being upheld in full, and is thus insufficient should any of the Defendant's exemption claims be invalidated.

As demonstrated above, OPM has failed to meet the burden of proof that it has fulfilled its duties to properly segregate non-exempt information. Plaintiff has demonstrated that the records have some degree of structure that should be usable for segregating records.

## CONCLUSION

As demonstrated above, the Defendant has failed to meet their burden of proof. For the reasons set forth in Plaintiff's motion and supporting documentation and this reply, this Court should grant Plaintiff's motion for summary judgment and order OPM to release the records without redacting the information within twenty days of this Court's ruling.

Respectfully submitted,

Ronald L. Sheridan, Jr.
345 N Springdale Rd.
Westminster, MD 21158-4043
410 984 3873
opm-foia-lawsuit@leebert.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of January, 2017, I caused the foregoing to be served on the following counsel for the Defendant by depositing it in first-class mail, postage pre-paid, and addressed it as follows:

>JEREMY S. SIMON
>Assistant United States Attorney
>Judiciary Center Building
>555 Fourth Street, N.W.
>Washington, D.C. 20530

>Ronald L. Sheridan, Jr.
>345 N Springdale Rd.
>Westminster, MD 21158-4043
>410 984 3873
>opm-foia-lawsuit@leebert.org

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RONALD L. SHERIDAN, JR [Pro Se], )<br>)<br>Plaintiff ) CASE NO: 16-cv-805-KBJ<br>)<br>vs. )<br>)<br>U.S. OFFICE OF PERSONNEL MANAGEMENT )<br>)<br>Defendant ) | |

## ORDER

Upon consideration of Defendant's motion for summary judgment, Plaintiff's cross-motion for summary judgment, and the oppositions thereto, it is hereby:

ORDERED that Defendant's motion is DENIED;

ORDERED that Plaintiff's Motion is GRANTED; and it is

FURTHER ORDERED that Defendant Office of Personnel Management shall produce to Plaintiff all requested records responsive to Plaintiff's FOIA request within twenty days of this Order.

DATED: _____          _____
                                                              Judge